GEORGE HEMMINGHAUS, (Plaintiff) Appellant, v. GERARD P. FERGUSON and EWELL L. MARKLAND, doing business as MACK ELECTRIC COMPANY, (Defendants) Respondents.—No. 40853.—215 S. W. (2d) 481.

Division Two, December 13, 1948.

*Everett Hullverson* for appellant; *Forrest Boecker* of counsel.

478

*Charles E. Gray* and *Chelsea O. Inman* for respondent Markland.

480

*Jones, Hocker, Gladney & Grand, Lon Hocker, Jr.,* and *James C. Jones III,* for respondent Ferguson.

[482] ELLISON, J.—The plaintiff (appellant) Hemminghaus sued the defendants (respondents) Ferguson and Markland in the circuit court of the City of St. Louis for $20,000 damages allegedly sustained by him in an in-line collision of three motor vehicles: defendant Markland's pickup truck; plaintiff's automobile; and defendant Ferguson's automobile. The jury returned a verdict for $2000 against both defendants. The trial court set it aside as to defendant Markland and rendered judgment for him notwithstanding the verdict. Sec. 120, Civil Code, Laws Mo. 1943, p. 389; Sec. 847.120 Mo., R. S. A. But it affirmed the judgment as to defendant Ferguson. From both of these rulings plaintiff appeals.

His principal assignments in his motion for new trial were, and are in his brief here: (1) that the verdict for $2000 against both defendants was so grossly inadequate as to import passion and prejudice on the part of the jury; (2) admission of incompetent evidence and improper argument based thereon by defendant's counsel; (3) that he made a case for the jury as to defendant Markland. Appellate jurisdiction is in this court under Art. V, Sec. 3, Const. Mo. 1945, because the difference between the amount sued for and the verdict returned exceeds $7500.

[483] The underlying facts may be preliminarily stated as follows. Plaintiff testified his automobile was in good working order. At the locus in quo on Morganford road in St. Louis defendant Markland's truck was traveling about 18-20 feet ahead of him. It stopped suddenly, but he applied his brakes and stopped 5-6 feet behind it with-

out a collision. He said (and defendant Ferguson denied) that he had a stop light in good working order on the back of his car. In 3-4 seconds Ferguson's car collided violently with his in the rear. This caused plaintiff's car to move forward and strike Markland's truck, and threw plaintiff's head back and forth. He did not see the truck driver's hand signal, if any. There was no obstructing traffic on either side to prevent Ferguson from swerving. He said Ferguson admitted he was not looking, and that he had insurance. This latter was corroborated by a policeman who came to the scene of the accident.

Plaintiff called as a witness defendant Markland's driver, who testified his truck was traveling about 20 miles per hour approaching an alley intersection, when he noticed his brakes were not functioning properly. There was no parallel obstruction traffic on either side of the road. He signaled with his left hand for a stop, and began to slow down about 30 feet or more from the alley. He stopped in about 25 feet and manipulated the brake handle. He did not make a sudden stop but "rolled along." With good brakes, at 25 miles per hour he could have stopped within 10 feet. He admitted he had had no other trouble with the brakes before or since. The truck stood there about 10 seconds. Plaintiff's automobile struck the truck in the rear, but when the truck driver got out and went around behind the two vehicles were not in contact, being separated by a distance of about three feet. A third automobile (Ferguson's) also was standing there.

Plaintiff also called the defendant Ferguson as a witness. The latter testified he was motoring about 20-25 miles per hour and could stop in 30-35 feet. Plaintiff's automobile was preceding him about 15-20 feet, and following behind the Markland truck about the same distance. The truck made an abrupt stop and plaintiff's automobile struck it, and his (Ferguson's) automobile struck plaintiff's automobile at the same time. In other words, the collisions between the three motor vehicles were practically simultaneous. He (Ferguson) admitted he did not sound his horn or swerve, but on cross-examination stated there was interfering traffic on one side and an automobile parked on the other, so that he could not turn out on either side.

██ On plaintiff's first point, that the verdict for $2000 was so grossly inadequate as to import passion and prejudice on the part of the jury, further facts must be stated bearing on the nature and extent of his damages, set at $20,000 in his petition. They consisted of loss of present and future earnings, damage to his automobile, medical expenses and personal injuries including present and future pain, suffering and discomfort.

As to his *definite* loss in earnings, damage to his car, expenses, etc., plaintiff testified he was 60 years old; that his average weekly earnings as a painter and paper hanger in St. Louis were $75 to $80; that he was employer "practically all the time"; that he had never been

sick before, except from common ailments, until he was injured in the collision on August 21, 1946; and that he had been unable to work since except for 16 hours on two days in the store of a man named Ent, where he fell off the ladder. His trial began on October 27, 1947. That was over 61 weeks after the casualty. Allowing a month for vacation and idle time, his earnings at the lower figure of $75 per week would have aggregated $4275 up to that time. In addition the estimated damage to his automobile was $249.50, and he owed his doctor $125. All these items totaled $4650, well over double the amount of the verdict. Standing alone they would have been persuasive evidence that the verdict was grossly inadequate, under the six decisions he cites.[1] In all of these except [484] the last (and there also, in part) the verdict was below the amount of damages proven by plaintiff and undisputed by affirmative contrary evidence in behalf of defendant.

But such was not the fact here. There was evidence for defendants that plaintiff did not earn as much per week as he testified, and that he was not totally incapacitated. One witness said plaintiff had done papering and painting for her five years and two years before and had charged only $21 or $22 for three days' work and $80 for two weeks' work. Another witness, Ent, whom plaintiff mentioned in his testimony (last paragraph) testified that in April, 1947, about six months after the casualty plaintiff had worked five or six days painting the walls and ceiling of one of his (witness') buildings; and in June, 1947, had done similar work on another building—without falling off the ladder so far as he knew or had heard. Later the plaintiff solicited further work painting some garages the witness owned. And a neighbor named Shamess said he observed no difference in plaintiff's condition before and after the casualty, and that he had seen him leveling his yard and preparing concrete blocks about a month before the trial.

The theory of plaintiff's regular physician, Dr. Ehrlich, his neurological expert, Dr. Sachs, and his other medical expert, Dr. Pernoud, was that the violent wrenching of his head and neck in the automobile collision had produced some injury to the base of his brain through hemorrhage, swelling or pressure. An X-ray picture disclosed no vertebral fracture. It was their opinion that this traumatic injury had impaired the nerve system leading from plaintiff's spinal cord to the left side of his body, as disclosed by such objective symptoms

[1]Grodsky v. Consolidated Bag Co., 324 Mo. 1067, 1077, 1080-3 (7, 8), 26 SW. (2d) 618, 621(5), 623(6); Fawkes v. Nat'l Refining Co., 341 Mo. 630, 640(9), 108 SW. (2d) 7, 12(16); English v. Thrower (Mo. App) 146 SW. (2d) 667, 668(2); Ulrich v. Kiefer (Mo. App.) 90 SW. (2d) 140, 143(1), 144; Strange v. Ardison (Mo. App.) 65 SW. (2d) 115, 118(2); Purkett v. Steele Undertaking Co. (Mo. App.) 63 SW. (2d) 509(1), 513.

as: pain on the application of pressure in that region, or manipulation of the head and neck; headache; nervousness; emotionalism; sleeplessness; dizziness; lack of equalibrium when attempting to walk with eyes closed; abnormal nerve reflexes in the left cheek, arm and leg; and loss of the sense of taste on the left side of the tongue. Various tests were applied, called the Hoffman, Romberg and Babinski tests. Dr. Ehrlich thought the plaintiff wouldn't be able to work at all; that his condition was permanent; that he was getting progressively worse; and his condition might even become more aggravated later. Dr. Pernoud thought he would not be able to work again; and Dr. Sachs said he was not absolutely certain, but classed him as more than 75% disabled.

But this testimony also was not unimpeached or uncontradicted. Dr. Sachs had examined the plaintiff twice, once in January, 1947, and again in October, 1947, shortly before the trial. After the first examination he made a report by letter to Dr. Ehrlich, plaintiff's regular physician. That was before this suit had been brought. In that report he said he found "no motor involvement of any sort," and that "reflexes are perfectly normal on both sides." At the trial he testified he did find abnormal reflexes in January, including the one disclosed by the Hoffman test. He declared the statements to the contrary in his letter to Dr. Ehrlich were made by mistake, as shown by his original notes made at the time.

Dr. Archie D. Carr testified as an expert for the defendants. He was a specialist in nervous and mental diseases and had examined plaintiff for an insurance company a little over three months after the casualty. He referred to the Hoffman, Romberg and Babinski tests mentioned above and, as we understand, used them in that examination. He said "the cranial nerves were all intact and the reflexes of the arms and legs were equal and positive." By agreement of counsel this witness read in evidence the written report of a Dr. Peden, who had made an X-ray examination of plaintiff's head. The report stated "Radiographs of the skull in all views do not show evidence of fracture either recent or old." Continuing, Dr. Carr testified plaintiff was tense, apprehensive, gloomy and emotional. He thought this was attributable to a psychopathic and not to any pathological condition.

Along the same line, Mr. and Mrs. Joseph [485] Beckmann testified that they had been well acquainted with plaintiff for over 20 years and that the two families had visited back and forth up to four years before the trial. They said a change took place in plaintiff's mental attitude and disposition about the time of the birth of his son, some seven years before the automobile collision and over 20 years after his marriage. He became apprehensive and gloomy, and would cry and withdraw to himself without apparent cause. He was afraid he

couldn't support the child, and cried because there were no grandparents (to support it?). Mrs. Beckmann further testified plaintiff was sick at one time during those years and swollen as with dropsy, from which he recovered "a long time after." He then had a physician named Stein who .saw him daily. Witness did not see the doctor there, but saw his name on a bottle of medicine, and plaintiff's wife told her. There was no testimony as to whether this swelling or dropsy would produce the conditions from which plaintiff claimed he suffered after the casualty. . But this testimony did tend to show plaintiff was nervous and despondent theretofore.

What rule of law should be applied to this conflicting evidence? Defendants' counsel cite two decisions[2] of. this court holding an appellate court has no *authority* to grant a new trial on the ground that a jury verdict was against the weight of the evidence, where the trial court had refused to do so. And they further hold that is true notwithstanding the verdict is asserted to be so erroneous as to indicate passion and prejudice. Defendants also cite two other decisions,[3] of · which the Wilhelm case holds the jury's discretion is "conclusive" on the weight of the evidence, as against the appellate courts, *unless* that discretion was *abusively* exercised. The Coghlan case holds that in the granting of a new trial by an appellate court the same . principle applies to both excessive and inadequate verdicts, the requirement being that the verdict must be so shockingly disproportionate to a reasonable award as to show passion and prejudice on the part of the jury. Thus it will be seen the two cases first cited are in conflict with the two last cited, the former denying and the latter conceding that an appellate court may order a new trial on the weight of the evidence when the verdict clearly betokens passion and prejudice.

While there have been other judicial pronouncements similar to the holdings in the Woehler and Block cases, just cited,[2] that appellate courts lack "authority" to grant a new trial on the weight of the evidence, we think they overstate the law. Thus, the author of the Block opinion conceded in an earlier case, Hunt v. Gus Gillerman Iron & Metal Co., 327 Mo. 887, 893, 39 SW. (2d) 369, 371(4), that an appellate court is authorized to grant a new trial on the weight of the evidence in a damage suit for personal injuries when there is no *substantial* conflict in the evidence as to the character and extent thereof, cited the Grodsky case, supra,[1] relied on here by plaintiff. Furthermore, it was expressly ruled by the court en banc in King v. K. C. Life Ins. Co, 350 Mo. 75, 87-8(4), 164 SW. (2d) 458, 464 (8-10) that both trial and appellate courts have power to grant a new trial on the weight of the evidence, although it was further observed

[2] Woehler v. St. Louis, 342 Mo. 237, 241-2(2), 114 SW. (2d) 985, 987(3); Block v. Kinder, 338 Mo. 1099, 1103(1), 93 SW. (2d) 932, 933(4).
[3] Wilhelm v. K. C. Pub. Serv. Co., 358 Mo. 6, 212 SW. (2d) 915, 918(4-7), 920(8); Coghlan v. Trumbo (Mo. Div. 2) 179 SW. (2d) 705.

that where the lower court has refused to do so the appellate court seldom will exercise the power because of the trial judge's better knowledge of the facts from his presence there. But basically it is a matter of policy, not power.

[486] That appellate courts have the power to grant new trials on the weight of the evidence alone (independent of passion or prejudice) is shown by a long line of decisions[4] where verdicts were reduced as *excessive*. In such cases the appellate court will order a remittitur conditionally on the theory that the excessiveness was the result of a mistake of the jury, and *not* of passion and prejudice. If the plaintiff refuses to abide by the reduction, a new trial is ordered. But if passion and prejudice be found the judgment will be reversed outright on the theory that they tainted the whole verdict. In these cases the evidence (whether conflicting or not) will be viewed in the light most favorable to the plaintiff, and under a "rule of uniformity" the propriety of the verdict will be adjudged largely on the basis of the monetary amounts allowed for similar injuries in other cases.

On the other hand, when it is contended that the verdict was *inadequate* the announced rule seems to be that each case must stand in the appellate court on its own facts; that there is no definite standard by which the damages may be ascertained; and that the verdict should not be disturbed unless found to be "shockingly" inadequate. See the Wilhelm and Coghlan cases, supra.[3] The so-called uniformity rule appears not to be in general use in determining the inadequacy of verdicts, though in Skidmore v. Haggard, 341 Mo 837, 850(5), 110 SW. (2d) 726, 733(9) the opinion stated: "The largest judgment we find to have been reversed for inadequacy, after the trial court approved the verdict, is $1000."—citing the Grodsky case supra.[1] But the respective personal injuries suffered in those two cases were wholly different and so the rule was that far ignored. However, there is at least one case, Dodd v. M-K-T. Rd. Co., 354 Mo. 1205, 193 SW. (2d) 905, where the trial court reduced the verdict by requiring a remittitur, the plaintiff appealed, and this court ordered the original verdict and judgment raised back to the original figure under the uniformity rule. We are unable to see any logical reason why that rule may not be used in a proper case to assail a verdict as inadequate and the result of passion and prejudice.

[4]Cook v. Globe Pr. Co., 227 Mo. 471, 539-547, 551(14, 17), 127 SW. 332, 352-6(21-3); Clark v. A. & E. Bridge Co., 333 Mo. 721, 731(9-10), 62 SW. (2d) 1079, 1082-3(12-14); State ex rel. St. Jos. Belt Ry. Co. v. Shain, 341 Mo. 733, 741(4), 108 SW. (2d) 733, 741-2 (4, 5); Easterly v. Am. Inst. Steel Const., 349 Mo. 604, 610(3), 162 SW. (2d) 825, 829(5); Willis v. A. T. & S. F. Ry. Co., 352 Mo. 490, 501-2(6), 178 SW. (2d) 341; Joice v. M-K-T. Rd. Co., 354 Mo. 439, 453(8), 189 SW. (2d) 568, 576(25), 161 A. L. R. 383; Ford v. L. & N. Rd. Co., 355 Mo. 362, 376(10), 196 SW. (2d) 163, 170(13); Walsh v. Term. Rd. Assn., 355 Mo. 377, 387(5), 196 SW. (2d) 192, 196(6).

But notwithstanding all this, it is our view that the plaintiff (appellant) has not made a sufficient showing here to obtain that relief, because the evidence is substantially conflicting as to the nature and extent of his injuries. This was not true in the cases he cites, supra.[1] The jury may not have believed he was injured as much as his expert witnesses testified. All reasonable presumptions are to be indulged in favor of the verdict. For that reason we rule this assignment against him.

Plaintiff's next point charges prejudicial argument to the jury by counsel for defendant Ferguson, based on plaintiff's failure to call as a witness his family physician Dr. Stein, heretofore mentioned. There is little, if any, evidence that Dr. Stein had any part in the treatment of plaintiff's injuries resulting from the casualty, since it appears without dispute that Dr. Ehrlich, heretofore [487] mentioned, in the same office building, was consulted by plaintiff about three hours thereafter, and had since been in charge of the case, because of the illness of Dr. Stein. On cross-examination plaintiff was asked how long he had been consulting Dr. Stein and he answered that he wasn't "doctoring" at the time of the casualty, though he had been going to Dr. Stein for 15 years, and supposed he would know his (plaintiff's) condition prior to the accident. But he said he hadn't seen or spoken to Dr. Stein since the casualty.

During his argument defendant Ferguson's counsel told the jury that he had presented to them all the evidence he could find; that he was not plaintiff's neighbor or lawyer; that he couldn't talk to his doctor; and that a confidential relation existed between physician and patient which prevented the former from disclosing facts learned from the latter in that relation. Counsel for plaintiff objected, stating the defendants could have talked to Dr. Stein, or taken his deposition, or produced him at the trial as a witness; and that plaintiff waived the confidential privilege when he filed this suit. Defendants' counsel argued the privilege would not be waived unless and until the plaintiff put the Doctor on the witness stand—which he had not done. The court overruled the objection.

Then defendant Ferguson's counsel proceeded to admit to the jury that he *could* have subpoenaed Dr. Stein and used him as a witness, but asked them if they thought he would be "fool" enough to do it, and thus bind his client by the testimony of a witness who had sustained such a close personal relation with the plaintiff for 20 years. Following that he asked "Where is that doctor," implying that plaintiff should have used him as a witness. To that plaintiff's counsel in answering argument asserted that defendants had taken plaintiff's deposition in May, five months earlier, and had ample opportunity to call Dr. Stein as a witness or take his deposition. Defendants' counsel renewed his previous objection and the court sustained it again.

Counsel for plaintiff cite several decisions[5] (to which we have added two others) in support of his contention that plaintiff waived his confidential privilege under Sec. 1895(5), R. S. 1939, Mo. R. S. A. as to Dr. Stein and thereby made the doctor equally available to the defendants as a witness, *by bringing his personal injury suit.* But the Epstein case,[5] first cited and chiefly relied on, does not so hold. On the contrary, Smart v. Kansas City,[6] cited therein, holds the exact opposite. The actual ruling in the principal opinion in the Epstein case [250 Mo. l. c. 34, 156 SW. l. c. 709] was that the privilege is waived by "offering one, out of two or more of his own physicians." That ruling might help plaintiff, if unconditionally sound. But even it was not authoritative. It appeared in the principal opinion of Faris, J., in which Brown and Walker, JJ. concurred. But there was a separate concurring opinion by Lamm, C. J., in which Brown, J. again concurred along with Graves, J. Another of the seven judges dissented and the other did not sit.

The concurring opinion of Lamm, C. J. considerably narrowed the principal opinion by holding "it does not mean that if a litigant uses a physician as a witness, that thereby, and without more, every other physician he has ever had at other times, places and occasions, may be thereby allowed to break the seal of professional secrecy." With Brown, J. not only agreeing to the principal opinion but also to the limited concurring opinion, the latter received three votes, leaving the principal opinion with only two votes on the disputed issue. There was no carrying vote on either opinion, but the opinion of Lamm, C. J. received a plurality vote, which, while not binding, is the most authoritative expression of the court in the case.

In all of the other cases, supra,[5] cited by plaintiff the doctors who had [488] treated the patient did so about the same time and for substantially the same ills. That was not true in this case with respect to Dr. Stein, so far as is shown. He treated plaintiff for dropsy eight years before, and the testimony came from defendants' witnesses (the Beckmanns), not plaintiff. There was, furthermore, no showing that plaintiff's dropsical condition had any connection with any nervous condition such as was claimed to have been produced by the instant casualty, though the Beckmanns did testify he was nervous at that time, and plaintiff admitted on cross-examination that he was concerned some about his child's being born so late in his own lifetime.

---

[5]Epstein v. Pa. Rd. Co., 250 Mo. 1, 23-26, 39, 45(2, 3), 156 SW. 699; 48 L. R. A. (N. S.) 394; Ann. Cas. 1915 A, 423; Weissman v. Wells, 306 Mo. 82, 86(1), 267 SW. 400; State v. Cochran, 356 Mo. 778, 785(3), 203 SW. (2d) 707, 711(4); Bouligny v. Met. Life Ins. Co. (Mo. App.), 160 SW. (2d) 474, 475(2); Wells v. City of Jefferson, 345 Mo. 239, 246-7(7), 132 SW. (2d) 1006, 1009-10(14); Cable v. Johnson (Mo. App.) 63 SW. (2d) 433, 439-40(11).

[6]Smart v. Kansas City, 208 Mo. 162, 184, 105 SW. 709, 714, 14 L. R. A. (N. S.) 565, 123 A. S. R. 415, 13 Ann. Cas. 932.

We think plaintiff did not prove by any substantial evidence that he waived the incompetency of Dr. Stein as a witness.

But if there be any doubt about it, the question is covered by other decisions cited by defendants. Whatever admissions plaintiff made were either on cross-examination on the stand, or in a deposition taken by defendants before the trial. As to the former the rule is that to waive his confidential privilege under the statute, the party's admission must be voluntary, which is not the case when it is extorted under cross-examination.[7] The rule is the same with respect to admissions elicited by deposition, since, as to any adverse party they are taken under the rules applicable to cross-examination. Sec's 1894, 1899, R. S. Mo. 1939, Mo. R. S. A.; State ex rel. Williams v. Buzard, 354 Mo. 719, 724(1), 190 SW. (2d) 907, 909(2).

In addition to that, defendants have cited McInnis v. St. L. So. Inc., 341 Mo. 677, 683(2), 108 SW. (2d) 113, wherein it was held that even though a party be conceded to have waived his statutory confidential privilege with respect to his physican in a deposition taken by the other party, but fails to call the physician as a witness at the trial, yet he cannot relieve himself of the unfavorable inference that may be drawn therefrom by suggesting that such other party could call the witness—this because of the greater availability of the physician to the patient, and the fact that such adversary party would be compelled to vouch for the physician's credibility and could not cross-examine him.

The plaintiff's next point complains of leading and suggestive redirect examination by defendant Ferguson's counsel of his witness Ritter, a civil engineer employed by the City of St. Louis in placing stop and slow signs on its streets. He testified as an expert on the distances in which automobiles could be stopped at given speeds, with the aid of a table prepared by the U. S. Bureau of Standards which he used in that work. On direct examination he said at 20 miles per hour the stopping distance would be 50 feet, the time consumed (as we understand) being represented by 44% perception time and 56% actual braking time and in distance by 22 feet and 28 feet. At 25 miles per hour it would total 70 feet. On cross-examination plaintiff's counsel read to the witness from page 108 of a book compiled by Northwestern University giving similar data for an unspecified speed, as follows: "Theoretically, a car with 100% braking could be stopped at 20 miles per hour in 13.3 feet," and "with 50% braking power the stopping distance would be 26.6 feet." Then counsel went on to show

---

[7]Holloway v. Kansas City, 184 Mo. 19, 44-5(10), 82 SW. 89, 95-6(6); Vermillion v. Prudential Ins. Co., 230 Mo. App. 993, 1005(5), 93 SW. (2d) 45, 51(8); Rush v. Met. Life Ins. Co. (Mo. App.) 63 SW. (2d) 453, 455(7); Cable v. Johnson, supra, 63 SW. (2d) 433, 438-9(10); Monpleasure v. Am. Car & Fdry. Co., 293 SW. 84, 86(3).

(by questions) how long a time a second really is, and stated a watch ticks 300 times per minute.

On redirect examination here objected to, defendant's counsel read to the witness what he called "context" on pages 104 and 106 of plaintiff's Northwestern book, stating the average reaction time of a motorist is about .75 seconds, so that at 40 miles per hour, or 59 feet per second, a normal reactor would have traveled 44 feet before he could start to brake, and asked the witness if he agreed to that. He answered that was the same as "this", meaning, as we understand, the U. S. Bureau of Standards table in his hand. Continuing, counsel [489] reread the part plaintiff's counsel had read, and the next sentence, stating the figures would depend on the size and condition of the brakes, and the force applied. He then asked the witness if he agreed to that, and the witness answered that he had made no such tests, but assumed from his own book in comparison that the statement was correct. After an interval defendant Ferguson's counsel declared he had found something else on page 105 in plaintiff's book, and read it to the witness, asking him if he agreed to it. It stated the national conference on Streets and Highway Safety recommended 44.4% as the minimum legal requirement for braking (reaction?) and the witness said the same was in his own book. It further said on that basis the stopping distance at 20 miles per hour would be 52 feet, two feet more than the witness had stated in the beginning.

. The law is well established that text books on technical subjects are not of themselves direct and independent evidence. But it is also settled that they may be used in *cross*-examination of an expert witness by reading therefrom and inquiring whether the witness agrees therewith.[8] In this case, however, defendant's counsel read to his expert witness on *redirect* examination, from the Northwestern book, after plaintiff's counsel had brought that book into the case and cross-examined the witness on it, the text used by defendant in the original direct examination having been another text, the U. S. Bureau of Standards table. It is clear that both parties treated the Northwestern text as authoritative. And the questions asked by defendant's counsel on redirect examination were pertinent in view of the cross-examination. We think the mere fact that they were asked on redirect examination did not constitute error, or at least not reversible error. Sec. 123, Civil Code, Laws Mo. 1943, p. 390, Sec. 847.123 Mo., R. S. A. It was so held in a somewhat similar situation, Zesch v. Abrasive Co., 354 Mo. 1147, 1154(2), 193 SW. (2d) 581, 585(3).

Plaintiff's last point is that he made a submissible case against the defendant Markland on the theory that the latter stopped sud-

[8]Cooper v. A. T. & S. F. Ry. Co., 347 Mo. 555, 567(5), 148 SW. (2d) 773, 779 (10-12); MacDonald v. Met. St. Ry. Co., 219 Mo. 468, 491(9), 118 SW. (2d) 78, 85-6(11, 12).

denly and unexpectedly without warning. But it is to be remembered plaintiff, himself, testified he was 18-20 feet behind Markland's truck; that he applied his brakes when it suddenly stopped, and brought his own car to a stop 5-6 feet behind it. Thereafter 3-4 seconds (in his deposition he said 30 seconds) elapsed before Ferguson's automobile struck his car and knocked it into the truck. However, plaintiff used the defendant Ferguson as his witness, and the latter testified his car struck plaintiff's car and plaintiff's car struck the truck practically simultaneously. Plaintiff also used as his witness the truck driver, but the latter didn't see the cars behind him. He said he gradually stopped his truck and stood for 10 seconds before the collision.

Plaintiff maintains he is not bound by his own estimates of time and distance, and argues he can adopt the foregoing testimony of defendant Ferguson that the collision of all three vehicles was practically simultaneous, citing State ex rel. Thompson v. Shain, 351 Mo. 530, 537(1), 173 SW. (2d) 406,407(2). By so doing he can make out a case against the defendant Markland. But as against the defendant Ferguson, he prefers to rely on his own testimony and that of the truck driver showing Ferguson had plenty of time to avoid a collision. The rule stated in the Thompson case, just cited, is good law, but it does not permit a plaintiff to go to the jury on conflicting theories of fact—one version for one defendant, and an opposite theory for the other, thereby recovering against both.

We find no error in the record and the judgment is affirmed. *Tipton, P. J.,* concurs; *Leedy, J.,* absent.