Jeanette SAGMILLER, Plaintiff/Appellant,

v.

D. A. CARLSEN, M.D., Defendant/Appellee.

Civ. No. 8905.

Supreme Court of North Dakota.

June 28, 1974.

Frederick E. Saefke, Jr., Bismarck, for plaintiff/appellant.

William C. Kelsch, Mandan, for defendant/appellee.

VOGEL, Justice.

This is an appeal from a judgment of the Morton County District Court, Sixth Judicial District, entered on March 8, 1973, which granted a motion for summary judgment pursuant to Rule 56, N.D.R.Civ.P., and dismissed a medical malpractice action because of plaintiff's failure to show by affidavit or otherwise that she had expert medical testimony to establish the standard of medical care in the area and the failure of the defendant doctor to meet that standard, and that such failure was the proximate cause of her alleged injury.

Our statement of the facts is based upon the record on appeal, including the depositions of Dr. James Moses and the plaintiff, Mrs. Jeanette Sagmiller, answers to interrogatories, and documents submitted in support of the defendant Dr. D. A. Carlsen's motion for summary judgment, including Dr. Carlsen's affidavit supporting the motion, Mrs. Sagmiller's affidavit opposing the motion, and two affidavits of Dr. P. M. Riisager.

On April 14, 1970, Dr. D. A. Carlsen surgically performed an anterior posterior repair of Mrs. Sagmiller's vagina, commonly known in the medical profession as an A and P repair. The surgery was necessary to correct a condition known as "cystocele", which is a hernial protrusion of part of the female bladder into the opening of the vagina, resulting in inability to control the passage of urine. The operation involves the suturing together of the muscle layers surrounding the bladder in an effort to hold the bladder in its normal position. Following surgery, urine is drained by use of a catheter. The catheter is passed through the urethra into the bladder and is called a urethral catheter.

The urethral catheter initially inserted on April 14, 1970, in Mrs. Sagmiller's bladder remained in place for approximately three days, after which time it was removed for a period of twenty-four hours. When Mrs. Sagmiller was unable to void the contents of her bladder, the urethral catheter was reinserted. This second catheter remained inserted overnight and was removed again the next morning. A third catheter was inserted at approximately noon of the same day. Mrs. Sagmiller testified at her deposition that during her nine-day stay in the hospital the urethral catheter was inserted and removed approximately four times because she was unable to void the contents of her bladder. She left the hospital with a catheter in place, complaining that the catheter did not feel right and that the area where the catheter was inserted was tender from one catheter being removed and another inserted.

Mrs. Sagmiller was released from the hospital on April 22, 1970, with instructions to leave the catheter in place until April 30, 1970. On April 27, 1970, due to the increasing discomfort, she called Dr. Carlsen to complain of pain in the bladder area. Dr. Carlsen requested she come to his office. When she arrived, she was taken to an examination room by a nurse, given a gown, and asked to remove her clothing.

Mrs. Sagmiller asserts that Dr. Carlsen did not examine the operative site, nor did he take her temperature, pulse, or blood pressure. She says that Dr. Carlsen merely instructed her to go to the Mandan Hospital for a urinalysis, which she did.

Upon awakening the next morning, on April 28, 1970, Mrs. Sagmiller found evidence on her clothing of light internal bleeding. She called Dr. Carlsen and was told she had an infection. Dr. Carlsen telephoned a prescription to her drugstore to be used in combating the infection.

Mrs. Sagmiller called Dr. Carlsen the next day, April 29, 1970, to inquire if he still wanted her to remove the urethral catheter on April 30, 1970, as she had been instructed to do, even though there was continued bleeding. Dr. Carlsen answered in the affirmative. Mrs. Sagmiller removed the catheter at 8 o'clock, the morning of April 30, 1970, as instructed. The appointment with Dr. Carlsen was scheduled for one o'clock that afternoon. By 10:30 a. m. Mrs. Sagmiller was experiencing discomfort from her inability to void the contents of her bladder. At approximately 11 a. m. she called Dr. Carlsen to explain the problem. Dr. Carlsen told her to come to his office immediately. In his affidavit Dr. Carlsen states that in the process of inserting a catheter to drain the urine and relieve the pressure on Mrs. Sagmiller's bladder, he observed it pass through a fistula, or opening, in the distal portion of the urethra. Mrs. Sagmiller was rushed to the hospital, where a suprapubic drainage was carried out, relieving the pressure on her bladder. A urethral catheter was inserted the next day. Mrs. Sagmiller was hospitalized on this occasion for approximately five or six days. Upon her discharge, Dr. Carlsen informed Mrs. Sagmiller she would have to wear a catheter for from four to six more weeks.

It was after her second release from the hospital that Mrs. Sagmiller consulted Dr. James A. Moses, a urology specialist.

Mrs. Sagmiller first saw Dr. Moses on May 8, 1970, and was instructed to return eight days later for another examination. Due to pains in the vaginal area, Mrs. Sagmiller was readmitted to the hospital on May 11, 1973, this time by Dr. Moses. Mrs. Sagmiller then spent two weeks in the hospital undergoing a series of operative procedures performed by Dr. Moses, such as a cystoscopic examination under general anesthesia and several attempts to dilate or extend the urethra which were performed under local anesthesia. Upon her third release from the hospital, Mrs. Sagmiller was able to void the contents of her bladder without the aid of a catheter; however, the fistula, or hole in the urethra, allowed urine to pass into and collect in the vaginal area during urination.

Mrs. Sagmiller wore a pad to absorb the urine, which required frequent changes. These pads were worn for approximately three months, through the month of August.

Dr. Moses operated to repair the fistula in November of 1970. Mrs. Sagmiller asserts that she continues to have a small opening between the urethra and the vaginal wall.

In her complaint Mrs. Sagmiller asserts, in essence, that Dr. Carlsen failed to exercise that degree of skill, learning, and care ordinarily exercised by other physicians and surgeons in his specialty, in the city of Mandan and similar localities, in his care of the plaintiff; that he negligently operated on and treated her so that she received an injury to her urethra; that he negligently and carelessly failed to post-operatively attend and treat the plaintiff; and that his negligence was the proximate cause of her injury.

Dr. Carlsen took the deposition of Mrs. Sagmiller and sought to take the depositions of Dr. Moses and Dr. Riisager, who Mrs. Sagmiller had stated would be the witnesses she would call at trial. Dr. Carlsen was unable to take the depositions of Dr. Moses and Dr. Riisager prior to trial because Mrs. Sagmiller refused to release the doctors from the doctor-patient privilege. A deposition was scheduled for Dr. Moses. He appeared, stated he had not been released from the doctor-patient privilege, and therefore it would be inappropriate for him to testify.

Dr. Carlsen then moved for summary judgment based upon discovery he had conducted and his own affidavit in which he stated that he had performed his services in accordance with the standards of practice in his specialty in the area, that the fistula was a complication of the surgery, that the fistula was not caused by any negligence on his part, and that no one can say with any medical certainty what caused the fistula.

Because this is a highly technical field of endeavor, we quote from his affidavit at length, as follows:

"The surgery I performed on Jeanette to repair her bladder was proper. It was successful and all the services I performed met or surpassed the standards of practice for this area. She did experience inability to void for a period following the operation. I regard this as a good symptom, for it indicates a successful reversal of the urinary incontinence. My experience dictates that with the use of a urethral catheter and the passage of time, the bladder sphincter will relax and normal voiding will follow. Unfortunately, Jeanette developed a urinary infection following her leaving the hospital. The infection aggravated the retention problem, and then the urethral fistula appeared. Urethral fistulas can be caused by infection; direct incision in the course of surgery; the placing of a suture through the urethra; or tissue death because of disruption of the blood supply to the area as a result of major surgery. A fistula caused by any of the above is an unfortunate but ever present complication attendant to an A and P repair. In addition, trauma to the area following surgery is a possible cause.

"It is impossible for anyone to say with any reasonable medical certainty just what caused Jeanette's fistula. I believe it was the infection that caused the tissue to break down, but I cannot say that with any medical certainty. What I can say is that the occurrence of the fistula was a complication of the surgery. That it was not caused by any negligence on my part. Once the fistula was discovered, I commenced a program of proper treatment, but because of Jeanette's choice, was discharged as her physician.

"I am familiar with the care and skill customarily exercised by physicians in this area for similar problems. In my opinion, I exercised the reasonable care and skill as are exercised ordinarily by physicians practicing in similar localities in this same line of medicine."

Mrs. Sagmiller filed her return to the motion together with her affidavit stating Dr. Moses and Dr. Riisager would be testifying on her behalf concerning her condition, and an affidavit of Dr. Riisager which stated he would testify in court that Dr. Carlsen did not follow the standards of care ordinarily exercised by physicians and surgeons in Mandan, North Dakota, and similar localities in his care and treatment of Mrs. Sagmiller. The pertinent part of that affidavit reads:

"That from the hospital records, history received by Jeanette Sagmiller and review of the case with Mr. Saefke, Mrs. Sagmiller's attorney, it is my opinion and I would so testify in Court, that Dr. D. A. Carlsen, defendant in the above entitled action, did not follow the standards of care ordinarily exercised by physicians and surgeons in Mandan, North Dakota and similar localities, in his care and treatment of Jeanette Sagmiller."

At the hearing on Dr. Carlsen's motion for summary judgment, he submitted a supplemental affidavit of Dr. Riisager, the pertinent part of which states:

"To clarify my views of this case, I would state that it is my opinion, if I had been the surgeon, when the patient complained on April 25th of marked increase in discomfort, and certainly on April 27th when she called at the office, I would have seen her and examined the operative site for any possible complications. It is my opinion that the symptoms mentioned indicate the development of a possible fistula. It is possible that the insertion of a smaller catheter at that time, together with the treatment by antibiotics, would have averted the development of the fistula. It is also quite possible that such treatment would not have averted the development of the fistula. While I would have followed a different course of care of this patient, I cannot say with any medical certainty that such different course would have averted her complications leading to the second surgery."

In the order granting summary judgment, the trial judge took the position that Mrs. Sagmiller could not establish her case without medical testimony; that she had failed to show that she had any evidence which would establish her claim for relief, that is, the standard of care and the failure to meet that standard, and that such failure was the proximate cause of the fistula.

The basic issue here is whether the granting of summary judgment was proper.

## I. SUMMARY JUDGMENT

Rule 56(c) provides that, if a motion for summary judgment is made,

"Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law."

Rule 56(e) provides:

". . . When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

In construing Rule 56, the first question to be decided is whether the showing made by the movant, without regard to whether and how the opposing party has responded, "show[s] that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." As stated in Rice v. Chrysler Motors Corp., 198 N.W.2d 247 (N.D.1972):

"The rule does not authorize the entry of a summary judgment merely because the adverse party fails to respond by filing proof in opposition unless it is appropriate to do so. [198 N.W.2d 247, at 252]

. . . . . .

"The rationale of this holding is that the movant is not relieved of the burden to show there is no trial issue of any material fact before he is entitled to a summary judgment as a matter of law. [Citations omitted.] [198 N.W.2d 247, at 252]

. . . . . . .

". . . under this rule a motion for summary judgment will be granted only if, after taking the view of the evidence most favorable to the [opposing] party . . ., it appears there is no genuine issue as to any material fact and that the party seeking the summary judgment is entitled to it as a matter of law. Weidner v. Engelhart, 176 N.W.2d 509 (N.D. 1970); Titus v. Titus, 154 N.W.2d 391 (N.D.1967)." [198 N.W.2d 247, at 253]

We hold that the movant failed to sustain the burden of showing that there was no genuine issue as to any material fact so that he was entitled to a judgment as a matter of law.

Dr. Riisager's first affidavit states that the defendant did not follow the standards of care ordinarily exercised by physicians and surgeons in Mandan, North Dakota, and similar localities, in his care and treatment of Jeanette Sagmiller. Dr. Carlsen contradicts this in his affidavit by saying that he did exercise the reasonable care and skill ordinarily exercised by physicians practicing in similar localities. This creates a question of fact.

Similarly, Dr. Riisager's second affidavit states that it is possible that the insertion of a smaller catheter, together with treatment by antibiotics, would have averted development of the fistula. This shows that there is a question of fact as to whether the proximate cause of the injury complained of was the insertion of a catheter which was too large. Thus there is a question of fact as to the proximate cause of the injury complained of.

When Dr. Riisager says that he would have treated Mrs. Sagmiller differently, and that it is "quite possible" that such different treatment would not have averted the development of the fistula, he is also stating that it is possible that such different treatment would have averted the development of the fistula. Again, the affidavit shows that a fact question exists as to the correctness of the treatment and the causation of the injury.

And when Dr. Carlsen in his affidavit says that the plaintiff's problem can be caused by "infection; direct incision in the course of surgery; the placing of a suture through the urethra; or tissue death because of disruption of the blood supply to the area" or by "trauma to the area following surgery" and that "it is impossible for anyone to say with any reasonable medical certainty just what caused Jea-

nette's fistula," he admits that he may have been negligent and that his negligence may have caused the fistula.

His statement that it is impossible for anyone to say just what caused the fistula is, of course, a mere opinion as to what the opinion of others may be. It is not a fact.

■ Opinion evidence usually is not of that conclusive character required for the rendition of a summary judgment. Bond v. Snow, 422 S.W.2d 842 (Tex.Civ.App. 1968); Weidner v. Engelhart, 176 N.W.2d 509 (N.D.1970); McGlamry v. Smallwood, 124 Ga.App. 401, 184 S.E.2d 52 (1971). And see Mealey v. City of Laramie, 472 P.2d 787 (Wyo.1970).

■ The case law on the question of the sufficiency of affidavits supporting motion for summary judgment in malpractice cases is rather sparse, perhaps reflecting the general rule that summary judgment is rarely granted in negligence cases. We have so held, in Wolff v. Light (first case), 156 N.W.2d 175 (N.D.1968), and in Titus v. Titus, 154 N.W.2d 391 (N.D. 1967). 6 Moore's Federal Practice (2d Ed.), Sec. 56.15, p. 2285.

■ We have also held that where proof required to sustain the claim of the plaintiff must be drawn largely from the defendant, who is hostile to the plaintiff's claim, and the plaintiff may have to rely principally on cross-examination to establish his claim, the affidavit of the defendant should not be accepted as conclusive so as to preclude any trial of the issue involved. Weidner v. Engelhart, *supra*.

In Holl v. Talcott, 191 So.2d 40 (Fla. 1966), while the court recognized the possibility that a defendant in a malpractice case could show conclusively that the negligence charged was not causally related to the plaintiff's injury, it held that affidavits of the defendant (which were far more detailed than the defendant's affidavit here), containing generalized assertions of compliance with accepted standards, did not "in themselves demonstrate conclusively that the respondents were not guilty of malpractice so as to justify a determination that as a matter of law there was no genuine issue of material fact necessary to be tried." The court also stated:

"To the extent that the affidavits counter the charges of the complaint they seem to us to constitute little more than a plea of not guilty. The statements that all done was in accord with accepted practice and standards in the community are subject to the same criticism that the respondents levy against Dr. Graubard's affidavit, i. e., that they are 'net opinions.' As defined by some of the respondents, such an opinion 'is a naked assertion—unsupported by an expert medical explanation of its basis or the reason it was reached. * * *' We conclude that considering all applicable rules and principles the respondents as movants did not meet the burden of demonstrating conclusively the absence of genuine issues of material fact. This being so the sufficiency of the petitioners' affidavit should never have been reached." 191 So.2d 40, at 45.

Several cases granting motions for summary judgment in malpractice cases are distinguishable in that the plaintiff in those cases advised the court that he had no medical evidence and was unable to obtain any. Shoberg v. Kelly, 1 Wash.App. 673, 463 P.2d 280 (1970); Abernethy v. Smith, 17 Ariz.App. 363, 498 P.2d 175 (1972); and Sanders v. Frost, 112 Ill.App.2d 234, 251 N.E.2d 105 (1969). In the present case, Mrs. Sagmiller has formally stated that Drs. Riisager and Moses will testify in her favor.

■ Since we have held that the defendant, on his own showing, was not entitled to summary judgment under Rule 56(c), we need not consider the sufficiency of the responsive affidavits submitted by the plaintiff.

## II. RES IPSA LOQUITUR

In passing on the question of whether the defendant is entitled to summary judgment, we have given the plaintiff no benefit of the presumption arising from the doctrine of res ipsa loquitur where it applies.

■ While that doctrine may aid a plaintiff in some medical malpractice cases, and may indeed be used in lieu of expert medical testimony in some such cases, it applies only where the facts showing negligence are within the understanding of laymen, and the probability of the adverse result from the facts shown within the common knowledge of laymen. The rule is stated in the decision of U. S. District Judge Davies, construing North Dakota law, in Swanson v. Hill, 166 F.Supp. 296 (D.C.N.D.1958):

"The only exception to the principle that the doctrine of *res ipsa loquitur* may not be invoked in actions for malpractice, consists of cases where the undesirable result is such that it is evident even to a layman and could not have occurred except for the doctor's negligence, as, for instance, when a foreign object is left in a wound after an operation." [Quoted from Johnston v. Rodis, D.C.1957, 151 F.Supp. 345, 346.]

A case where the physical facts are nearly identical with the instant case is Siverson v. Weber, 57 Cal.2d 834, 22 Cal. Rptr. 337, 372 P.2d 97 (1962). The California Supreme Court held that the doctrine of res ipsa loquitur did not apply.

■ We hold that it does not apply here.

## III. WAIVER OF PHYSICIAN–PATIENT PRIVILEGE

Since we are remanding the case for further proceedings, we will consider another issue which is sure to arise at the trial level.

That issue involves the doctor-patient privilege and the permissible scope of interrogation of a nondefendant treating physician when he is asked to testify in conjunction with a pretrial deposition.

Consistent with Rule 26(b)(4)(A)(i), Dr. Carlsen, by written interrogatory, requested Mrs. Sagmiller to disclose the names of any expert witnesses she intended to call at trial, the subject matter on which they were expected to testify, the substance of the facts and opinions the experts were expected to testify to, and a summary of the grounds for each opinion. In her answer to the interrogatory, Mrs. Sagmiller stated that Dr. Moses would be her expert witness. It later developed that Dr. Riisager would also testify on her behalf. Dr. Carlsen then scheduled the deposition of Dr. Moses. Counsel for Mrs. Sagmiller appeared specially at the deposition of Dr. Moses and stated that Mrs. Sagmiller had not released Dr. Moses to testify as to matters pertaining to the doctor-patient relationship. When Dr. Moses stated that he did not think he should or could testify concerning his treatment of Mrs. Sagmiller unless she authorized him to do so, the deposition was terminated.

Dr. Carlsen took the deposition of Mrs. Sagmiller, wherein she refused to allow Dr. Carlsen to take a deposition of her personal physicians, Dr. Moses and Dr. Riisager. By refusing to waive the doctor-patient privilege, Mrs. Sagmiller prevented Dr. Carlsen from learning whether Dr. Moses or Dr. Riisager would support her claim for relief.

It should be noted that the trial court allowed Mrs. Sagmiller additional time to secure an affidavit from Dr. Moses indicating that he would testify at trial as to the standard of care in the area and its violation and the proximate cause of Mrs. Sagmiller's injury, and such an affidavit was never produced. As it presently stands, Mrs. Sagmiller asserts that Dr. Moses will testify at trial, but the record is silent as to what his testimony will be.

The relevant North Dakota statute on the doctor-patient privilege is Section 31–01–06, Subsection 3, N.D.C.C.:

"3. A physician or surgeon, without the consent of his patient, cannot be examined as to any information acquired in attending the patient or as to any communication made by the patient to him in the course of professional employment; . . ."

In discussing the origin and purpose of the doctor-patient privilege, this court in an early decision said:

"At common law, an attorney was not permitted to testify as to communications made by his client, or knowledge acquired during consultations, but no such privilege was extended to physicians and patients. As to them the privilege is purely statutory, and was intended to inspire confidence in the patient and encourage him in making a full disclosure to the physician as to his symptoms and condition, by preventing physicians from making known to the curious the ailments of their patients, particularly when afflicted with diseases which might bring reproach, criticism, unfriendly comment, or disgrace upon the patient if known to exist." Booren v. McWilliams, 26 N.D. 558, 145 N.W. 410, at 414, Ann. Cas.1916A, 388 (1914).

Nothing that was said in the more recent case of Lembke v. Unke, 171 N.W.2d 837 (N.D.1969), discloses that the purpose of the present statute is different. Nor has Mrs. Sagmiller, who has thus far prevented the taking of the deposition of Dr. Moses and who has the burden of showing that the doctor-patient privilege applies even after a medical malpractice action is brought, shown that any different purpose was intended by the 1965 amendment of Section 31–01–06, N.D.C.C.

To make workable both the pretrial deposition-discovery mechanisms established by Rules 26–37, N.D.R.Civ.P., and Section 31–01–06, N.D.C.C., the statute embodying the doctor-patient privilege, we conclude that when Mrs. Sagmiller put her physical condition in issue by bringing the medical malpractice suit, she waived the doctor-patient privilege.

In so holding that an implied waiver of the privilege results from the initiation of a malpractice action, we are not thwarting the objectives of the statute securing the privilege, the patient having by bringing the action disclosed her ailments to the public. No good reason is shown for delaying the waiver until the time of trial.

The step we take today is one long advocated by commentators.

"§ 2389. Termination of the privilege (continued): Waiver by bringing suit; By testifying; By former waiver. (1) In the first place, the *bringing of an action* in which an essential part of the issue is the existence of physical ailment should be a *waiver* of the privilege for all communications concerning that ailment. The whole reason for the privilege is the patient's supposed unwillingness that the ailment should be disclosed to the world at large; hence the bringing of a suit in which the very declaration, and much more the proof, discloses the ailment to the world at large, is of itself an indication that the supposed repugnancy to disclosure does not exist. . . ." 8 Wigmore, Evidence (McNaughton rev. 1961) at 855.

"A shrinking from the embarrassment which comes from exposure of bodily disease or abnormality is human and natural. It is arguable that legal protection from such exposure is justified to encourage frankness in consulting physicians. But it is neither human, natural, nor understandable to claim protection from such exposure by asserting a privilege for communications to doctors, at the very same time when the patient is parading before the public the mental or

physical condition as to which he consulted the doctor, by bringing an action for damages arising from such condition. This in the oft-repeated phrase is to make the privilege not a shield only, but a sword. . . ." McCormick, Law of Evidence, Ch. 11, Waiver, § 106 (West Publishing Co. 1954), at 219.

In the instant case we are concerned with the pretrial discovery of two expert medical witnesses who are nondefendants, although treating physicians. The situation in McDonnell v. Monteith, 59 N.D. 750, 231 N.W. 854 (1930), a case referred to us by Mrs. Sagmiller, involved a waiver of the privilege at trial when the plaintiff examined his physician as his witness concerning his diagnosis and treatment of an injury to plaintiff's arm and the results of such treatment. The question of pretrial discovery was not raised.

Mrs. Sagmiller admits that she will have to waive the privilege at trial. Dr. Carlsen contends that he should have the right to discover the substance of Dr. Moses's and Dr. Riisager's testimony prior to trial.

Several reasons have been asserted by various courts in holding the doctor-patient privilege waived upon the bringing of an action such as this one, including the futility of upholding a privilege that will necessarily have to be waived at trial; the injustice to the defendant in preparation of his defense; and the scope and intent of relevant discovery rules or statutes.

The objectives of the pretrial deposition-discovery mechanism established by Rules 26–37 of the Federal Rules of Civil Procedure, which are quite similar to our Rules of Civil Procedure, have been summarized by Wright and Miller in Federal Practice and Procedure.

"The courts have recognized the utility of the discovery rules and have construed them liberally so that they may achieve the purposes for which they are intended. Some of these purposes are to avoid surprise and the possible miscarriage of justice, to disclose fully the nature and scope of the controversy, to narrow, simplify, and frame the issues involved, and to enable a party to obtain the information needed to prepare for trial. In this way it was sought to put an end to the 'sporting theory of justice,' by which the result depends on the fortuitous availability of evidence or the skill and strategy of counsel." Wright & Miller, Federal Practice and Procedure: Civil § 2001, pp. 17–19.

In Awtry v. United States, 27 F.R.D. 399 (S.D.N.Y.1961), a patient brought a malpractice action in the United States District Court, Southern District of New York, against Government physicians, alleging mental anguish from certain entries on his records made by Government physicians to the effect that he was a hypochondriac. The Government sought by interrogatories to inquire as to any private treatment the patient may have had prior to the alleged malpractice. The patient moved to strike these interrogatories. The court held:

"The nature of this action for malpractice is such that the plaintiff cannot possibly try it without waiving his statutory privilege, if he has not done so already. If the plaintiff goes to trial without waiving his privilege the defendant would undoubtedly have the right to apply for and obtain a suspension of the trial to enable the defendant to go into the subject matter which plaintiff has claimed to be privileged and which is material and necessary in its defense.

.    .    .    .    .    .

"Interrogatories addressed to parties under Rule 33 of the Federal Rules of Civil Procedure may relate to any matter 'not privileged' which is relevant to the subject matter involved in the pending action. See Rule 26(b). But this does not mean that plaintiff can take advantage of the physician-patient privilege to prevent defendant from inquiring in pretrial proceedings as to relevant and ma-

terial matters necessary to the defense. If such matters were deferred to the trial the almost inevitable result would be an interruption of the trial when the privilege had been waived by the plaintiff so as to permit the defendant to prepare its defense. In all likelihood a suspension of the trial would be impractical and it would be necessary to declare a mistrial.

"Whether the rule as to privilege be governed by state or federal law the plaintiff may not continue his action and at the same time deny to defendant the right to avail itself of the pre-trial procedures necessary to prepare its defense." Awtry v. United States, 27 F.R.D. 399, at 401, 402 (S.D.N.Y.1961).

In Burlage v. Haudenshield, 42 F.R.D. 397 (N.D.Ia.1967), decided by the United States District Court for the Northern District of Iowa, Burlage brought suit for personal injuries resulting from an automobile injury. Burlage consulted two medical doctors and a chiropractor regarding the injuries complained of.

Haudenshield sought to "depose" these three experts. Burlage attempted to assert the doctor-patient privilege, but the District Court refused to allow Burlage to assert the privilege. The court said:

"It is the court's view that defendant should be allowed to take the questioned depositions. The written reports of the two medical doctors have already been furnished to defendant, and plaintiff's counsel orally disclosed to defendant the findings of the chiropractor at the final pre-trial conference. Thus, it is probable that the privilege has been waived. Even if such disclosure does not constitute waiver, however, it is clear that plaintiff will have to waive the privilege at trial if he is to prove his damages. Since the information must eventually be disclosed in any event, the court sees no reason for delaying the disclosure until trial. The rules of discovery contemplate the fullest possible early disclosure of the facts to aid in trial preparation. *Discovery of privileged matter should be allowed when waiver of the privilege at trial seems reasonably probable.* See Greene v. Sears Roebuck & Co., 40 F.R.D. 14 (E.D.Ohio 1966); Mariner v. Great Lakes Dredge & Dock Co., 202 F. Supp. 430, 434 (E.D.Ohio 1962); Awtry v. United States, 27 F.R.D. 399 (S.D.N.Y.1961). See also 2A Barron & Holtzoff § 651; 2B Barron & Holtzoff § 967. [Emphasis added.]

"Aside from the ordinary questions of privilege and waiver, it is the court's opinion that the nature of the case at hand dictates that full disclosure of plaintiff's physical condition be made to defendant. The court's view is perhaps best expressed by the following language of Professor Moore:

" 'We believe that where a plaintiff in a personal injury action has put his physical condition directly in issue, he may not thereafter cloak communications to doctors or nurses, which were occasioned by the injury complained of, with the claim of privilege. This would not mean that the plaintiff could not assert privilege, if available, as to communications not germane to his claim. 4 Moore's Federal Practice ¶26.22[5], at 1297.' " 42 F.R.D. 397, at 398.

In State ex rel. McNutt v. Keet, 432 S. W.2d 597 (Mo.1968), the Supreme Court of Missouri held that when plaintiff sued for damages resulting from an automobile accident, such injuries were denied by defendants and thus became an issue in the case, the defendants were entitled to pretrial discovery of medical and hospital records of plaintiff bearing on injuries she claimed. In other words, the court held that the plaintiff waived the statutory doctor-patient privilege under those circumstances and thus made the medical and hospital records available to the defendant.

We quote from that case:

"It thus becomes largely a matter of timing as to when the waiver, inevitably to occur, is to be recognized, ' * * * on the very issues [plaintiff] has originated and would submit to judicial inquiry * * *', State ex rel. Williams v. Vardeman (Mo.App.), 422 S.W.2d 400, 408. If delayed until the trial is in process, then what happens is that the plaintiff either prevents the defendant from thereafter as a practical matter making effective use of the information available after waiver, while fully utilizing it for her own purposes, thus permitting plaintiff to use the privilege both as 'a shield and a dagger at one and the same time' (which we do not believe the legislature intended), or it is made necessary for the trial court to disrupt the trial by granting defendant a continuance to assemble the now available information, or to declare a mistrial. It would be an empty ceremony to proceed with a trial leading to the above alternatives merely to protect temporarily a privilege which will be waived as soon as plaintiff undertakes to prove her allegations of damages. We therefore hold that *once the matter of plaintiff's physical condition is in issue under the pleadings, plaintiff will be considered to have waived the privilege under § 491.060(5) so far as information from doctors or medical and hospital records bearing on that issue is concerned.* [Emphasis added.] In so far as Hemminghaus v. Ferguson, 358 Mo. 476, 215 S.W.2d 481; Smart v. Kansas City, 208 Mo. 162, 105 S.W.2d 709, 14 L.R.A., N.S., 565; and Foman v. Liberty Life Ins. Co., 227 Mo. App. 70, 51 S.W.2d 212 hold otherwise, they are overruled.

"A waiver at the point here announced will have no more effect on the relationship sought to be protected under the statute than would a waiver occurring after the trial has started. Our holding today, in the words of Hickman v. Taylor, 329 U.S. 495, 507, 67 S.Ct. 385, 392, 91 L.Ed. 451, '* * * simply advances the stage at which the disclosure can be compelled from the time of trial to the period preceding it, thus reducing the possibility of surprise * * *' This will help in reaching the ultimate object of every trial, which is to get at the truth, and we are unable to see how the interests of justice are served by permitting the plaintiffs to stand on the privilege before trial and then abandon it at trial." State ex rel. McNutt v. Keet, *supra*, 432 S.W.2d 597, at 601, 602.

We find the reasoning of *McNutt* applicable to this case.

Our holding in this case, however, extends only to malpractice cases. Whether the bringing of an action for personal injuries caused otherwise than by malpractice constitutes a like waiver, we leave for future decisions. As the quotations above indicate, some of the reasoning in favor of the waiver applies only to malpractice cases, and the only issue before us here relates to the rule in such cases. If and when the issue is raised, briefed, and argued in a different case, we will then decide it.

Reversed and remanded for further proceedings consistent with this opinion.

KNUDSON and TEIGEN, JJ., concur.

ERICKSTAD, Chief Justice (concurring in part and dissenting in part).

Having participated in the development of much of what is said in the majority opinion it having been taken with my approval from my proposed opinion reaching a contrary result on the issue of the correctness of the summary judgment, I concur with the majority opinion except in its conclusion to reverse the summary judgment of dismissal, the reasoning supporting that conclusion, and the parts of the syllabus sustaining it.

I would affirm the summary judgment.

Assuming for the sake of argument only that Dr. Riisager's first affidavit establishes that Mrs. Sagmiller has expert medical testimony tending to prove that Dr. Carlsen's performance in his treatment of Mrs. Sagmiller did not meet the standard of care practiced by physicians in his specialty in that locality, it fails to prove that Dr. Carlsen's treatment of Mrs. Sagmiller was the proximate cause of her difficulties.

Since Mrs. Sagmiller cannot prevail unless she can prove that Dr. Carlsen's alleged failure to perform according to the standard of care practiced in his specialty in the community was the proximate cause of her injury (the fistula and the resulting difficulties); and proof of proximate cause in a medical malpractice case such as the instant case must, because of the complexity of the matter, depend upon expert medical evidence (unless the facts justify the application of the doctrine of *res ipsa loquitur*), the failure on the part of Mrs. Sagmiller to produce expert medical evidence linking the alleged negligence of the doctor with the injury warranted the summary judgment of dismissal of the complaint.

In Shoberg v. Kelly, 1 Wash.App. 673, 463 P.2d 280 (1969), rehearing den. 1970, a summary judgment was granted on physician's motion in a malpractice action which also involved a vesicovaginal fistula, where plaintiffs failed to comply with Washington Civil Rule 56(e) and failed to make a showing that they had or would have medical expert testimony to prove the applicable standard of care and its violation by defendant physician. The only evidence submitted in *Shoberg* in opposition to the motion for summary judgment was an affidavit of plaintiff's attorney containing hearsay statements as to the doctor's alleged negligence, which tended to refute the affidavit submitted by the defendant doctor. It contained no evidence admissible for the purpose of establishing the truth of the facts stated, nor did it show the plaintiffs had expert testimony to support their claim. The court found the attorney's affidavit insufficient.

"Such hearsay was inadmissible for the purpose of establishing the truth of the facts stated. [Citations omitted.] Furthermore, plaintiffs were under the necessity of showing at the minimum through a medical expert, or otherwise, that they had or would have medical expert testimony to prove the applicable standard of care and its violation. Without such expert medical testimony plaintiffs could not prove negligence and could not recover." Shoberg v. Kelly, *supra,* 463 P.2d 280 at 282.

In Abernethy v. Smith, 17 Ariz.App. 363, 498 P.2d 175 (1972), rehearing den., review den., 1972, the Arizona Court of Appeals considered whether the trial court erred in granting summary judgment on the ground that the plaintiffs presented no evidence to support the allegations of malpractice. In *Abernethy,* the record did not show that the plaintiffs had any expert medical evidence to support their claim of malpractice. The court said that merely offering a list of medical experts the plaintiffs hoped would testify was insufficient.

*Abernethy* does not reach the problem which confronts us in the instant case, but it relied upon an Arizona case, although not a medical malpractice case, which I believe aids in deciding this case. It establishes the rule that in resisting a motion for summary judgment, one must come forward with facts sufficient to support the claim for relief.

"Where the motion for summary judgment filed by a defendant points out an absence of facts sufficient to establish a claim for relief, the plaintiff may not rest upon the allegations of the complaint but must come forward with facts which meet the test of the rules sufficient to support that claim for relief." Patton v. Paradise Hills Shopping Center, Inc., 4 Ariz.App. 11, 417 P.2d 382 at 385 (1966).

In the instant case, Mrs. Sagmiller did not come forward with medical evidence to establish that Dr. Carlsen's alleged negligence was the proximate cause of the fistula, and without that evidence she had no support for her claim for relief.

A case in point is Siverson v. Weber, *supra,* 22 Cal.Rptr. 337, 372 P.2d 97 (1962), a California case which was discussed in the majority opinion in relation to the applicability of the doctrine of *res ipsa loquitur* to the instant case. While *Siverson* does not involve a motion for summary judgment, it recognizes the necessity of proving proximate causation by means of expert medical testimony in cases where the doctrine of *res ipsa loquitur* is inapplicable. After summarizing the medical testimony which involved various explanations for the occurrences of fistulas the court said:

"There is nothing to indicate that if the fistula was caused by any of the factors listed above or any combination of them the injury sustained by plaintiff was a result of negligence.

   \*     \*     \*     \*     \*     \*

"It is obvious that neither the cause of plaintiff's fistula nor the question whether, in the light of past experience, it was probably the result of negligence by defendants is a matter of common knowledge among laymen. \* \* \*. No medical witness testified that in the rare cases where fistulas occur they are more probably than not the result of negligence. \* \* \*" Siverson v. Weber, *supra,* 22 Cal.Rptr. 337 at 339, 372 P.2d 97 at 99.

In Tessitore v. McGilvra, 105 Ariz. 91, 459 P.2d 716 (1969), rehearing den. 1969, the Arizona Supreme Court had before it an appeal from a summary judgment in favor of the defendants below, just as in the instant case. The court took the legal position, just as I do in the instant case, that for a plaintiff to establish negligence on the part of a physician or surgeon expert medical testimony must be presented to show the standard of skill of average physicians in that field in the community or similar localities, that the defendant doctor failed to exercise this degree of skill and that this breach of duty was the legal cause of plaintiff's injuries. In that case the court found the medical facts to be sufficient to create a material issue of fact and, accordingly, set aside the summary judgment. There being little medical evidence submitted on the issue of negligence and no medical evidence on the issue of proximate cause in the instant case, the different results are justified.

In a 1966 opinion of the Supreme Court of Florida, in which that court set aside a summary judgment in favor of the defendants in a malpractice action because the movants failed to conclusively show that genuine issues of material facts did not exist, that court in its opinion on petition for rehearing held that the burden of so showing could conceivably be met by showing conclusively that the negligence charged, or any committed by the physician or surgeon, was not causally related to the plaintiff's injury. Holl v. Talcott, Fla., 191 So.2d 40 at 47 (1966).

Under these circumstances, I conclude that the trial court correctly granted the motion for summary judgment of dismissal of the plaintiff's complaint.

PAULSON, J., concurs.