Charles A. ARNESON, Harry M. Butler, Jr., Donald A. Carlsen, and Glenn M. Thoreson, Plaintiffs and Appellees,

v.

Allen I. OLSON, Attorney General for the State of North Dakota, Byron Knutson, Insurance Commissioner for the State of North Dakota, and N. A. Macdonald, B. Jayapathy, A. F. Samuelson, A. J. Overland, G. L. Hamilton, J. E. Adducci, D. E. Wolf, J. J. Moses, G. M. Johnson, and J. A. Leigh, as Members of the State Board of Medical Examiners, Defendants and Appellants.

Civ. No. 9468.

Supreme Court of North Dakota.

Aug. 11, 1978.

Thomas O. Smith, Bismarck, for plaintiffs and appellees.

R. W. Wheeler, Sp. Asst. Atty. Gen., Bismarck, for defendants and appellants Allen I. Olson, Atty. Gen., and State Board of Medical Examiners.

William S. Murray, Sp. Asst. Atty. Gen., Bismarck, for defendant and appellant Byron Knutson, Ins. Commissioner.

Frederick E. Saefke, Jr., Bismarck, for Bruce Braun, amicus curiae.

VOGEL, Justice.

We are required in this appeal to determine the constitutionality of a part of Chapter 251, 1977 Session Laws, described as "AN ACT to limit professional liability of qualifying health care providers to patients electing to be bound, to create a trust fund for the benefit of patients suffering damage caused by negligence of the health care provider, and to establish a commission on. medical competency." Chapter 251 is codified as Chapter 26–40.1, N.D.C.C., containing the provisions as to medical malpractice claims and the establishment of a patient trust fund, and Chapter 43–17.1, N.D.C.C., containing the provisions establishing a commission on medical competency. No attack is made upon the constitutionality of the commission on medical competency, and we therefore express no opinion as to it. We hold that Chapter 26–40.1 is unconstitutional.

## I. THE STATUTE

The general purposes of Chapter 26–40.1 are stated to be:

". . . to assure the availability of competent medical and hospital services to the public in North Dakota at reasonable costs; to provide prompt and efficient methods for eliminating the expense involved in nonmeritorious malpractice claims; to provide adequate compensation to patients with meritorious claims; and to encourage physicians to enter the practice of medicine in North Dakota and remain in such practice as long as they are qualified to do so. The legislative assembly finds that the exercise of the sovereign and police power of this state for the good of the majority of its citizens is necessary to improve the availability of medical care, to assure its competency, and to reduce the cost thereof." Sec. 26–40.1–01, N.D.C.C.

Section 26–40.1–02 defines the terms used in the Act. The term "health care provider" is restricted to physicians only by the definition that the term "includes a person, corporation, facility, or institution authorized by law to provide professional medical services *as licensed physicians.*" [Emphasis added.] Section 26–40.1–02, subsection 4.

The term "physician" is defined as "a person engaged in the practice of medicine in this state pursuant to the provisions of chapter 43–17." Section 26–40.1–02, subsection 10. Chapter 43–17 relates to the licensed practice of medicine, surgery, and obstetrics, and by Section 43–17–02 excludes dentists, optometrists, Christian Science practitioners, medical officers of the armed forces of the United States, the Public Health Service, and the Veterans Administration, doctors of chiropractic, and chiropodists. These definitions also exclude from the operation of Chapter 26–40.1 such persons involved in health care as nurses, pharmacists, and nurse-anesthetists.

Other definitions will be referred to later in this opinion.

Section 26–40.1–03 provides that if a health-care provider qualifies under the statute, the patient's exclusive remedy

against the provider for alleged professional negligence, failure to provide care, failure to obtain informed consent, or any other claim based upon alleged professional negligence shall be as provided by the statute if the patient has consented to be governed by it.

Section 26–40.1–04 provides that a patient or his representative may elect to be bound by the terms of the statute by signing an acknowledgment on forms to be furnished by the Insurance Commissioner. The consent may be made by a mother for an unborn or newborn child or by a guardian or parent or representative of a minor or incompetent. If emergency treatment is required, the provisions of the chapter apply without consent. Otherwise, if consent is not given, the physician shall decide whether he will or will not provide services to the patient.

Section 26–40.1–05 provides that no claimant may recover for failure of the physician to obtain his informed consent unless he establishes "that a reasonably prudent person in the claimant's position would not have undergone the treatment had he been properly informed and that the performance of the treatment was the proximate cause of the injury and damages claimed."

Section 26–40.1–06 provides that no proceedings governed by the provisions of the chapter shall be joined with any action for recovery of damages against any health-care provider not qualified under Chapter 26–40.1, nor shall any cause of action under the chapter be assignable. Thus, under the terms of the statute, a joint cause of action against two physicians, one qualified under the Act and one not, involving the same surgical procedure, jointly performed by both, would have to be split into two separate actions. Similarly, a qualified doctor could not be joined as defendant with a pharmacist or a nurse or a nurse-anesthetist, even though the action is based upon joint negligence.[1]

---

1. The Act is inconsistent in its use of the term "health care provider." Compare §§ 26–40.1– 03 and 26–40.1–09. This makes unclear the propriety of joinder of claims against non-phy-

Section 26–40.1–07 specifies that no liability for professional negligence may be imposed against a health-care provider "unless expert medical testimony or an admission of fault by the health care provider is presented regarding the alleged deviation from the appropriate standard of care in the specific circumstances of the case and the causation of the alleged injury or death. Where evidence is presented that the injury or death occurred due to a foreign substance which was unintentionally left within the body of a patient following surgery or due to a surgical procedure which was performed upon the wrong patient or the wrong organ, limb, or part of the patient's body, medical expert testimony shall not be required, and such evidence shall constitute a rebuttable presumption that the personal injury or death was caused by negligence." The effect of this provision is to severely limit the application of the doctrine of res ipsa loquitur [2] in medical-negligence cases, and require expert medical testimony to establish negligence except in very limited situations.

Section 26–40.1–08 eliminates the "collateral source" doctrine heretofore approved by this court in *Ostmo v. Tennyson*, 70 N.D. 558, 296 N.W. 541 (1941), and *Regent Cooperative Equity Exchange v. Johnston's Fuel Liners, Inc.*, 122 N.W.2d 151 (N.D.1963), and provides that damages for bodily injury or wrongful death under the statute, which includes damages for out-of-pocket expense for care, are to be reduced by any "nonrefundable medical reimbursement insurance benefit, less premiums paid by or for the claimant over the immediate preceding five years." Thus, the tortfeasor is to have the benefit of insurance privately purchased by or for the tort victim, except to the extent that five years' premiums will be repaid.

Section 26–40.1–09 requires all health-care providers within the State to file proof of financial responsibility in the amount of $100,000 for each occurrence. Without such insurance the health-care provider is not qualified under the statute. Under Section 26–40.1–10, failure to qualify subjects the provider to immediate cancellation of his license to practice.

Section 26–40.1–11 limits the liability of a health-care provider qualified under the Act to $300,000 for all claims arising from any one occurrence.

Section 26–40.1–12 provides that financial responsibility may be established by filing proof of insurance by a policy of professional liability insurance in the amount of $100,-000 per occurrence. Such insurance may limit total liability in any policy year to $300,000 for all occurrences or claims made in any policy year.

Section 26–40.1–13 requires 60 days' notice of cancellation of insurance, and Section 26–40.1–14 permits advance payments by a health-care provider or insured to a claimant, with the right to offset such payments against final judgment. Advance payments are not subject to refund by the recipient.

Section 26–40.1–15 provides for the creation of a patient trust fund to be administered by the Commissioner of Insurance. The fund is to be financed by assessments on health-care providers, who may be assessed not to exceed 150 percent of the cost of the qualifying liability insurance coverage as determined by the Commissioner. A surcharge is provided if the fund becomes inadequate to meet existing and contingent liabilities.

Section 26–40.1–16 provides that a court in its discretion may provide in a judgment for payments from the trust fund to a

sician professionals in the health field with claims against qualified physicians. However, our decision as to the constitutionality of § 26–40.1–06 would not be changed if joinder of non-physician health-care professionals were permitted. Preclusion of joinder of claims against nonqualified physicians would raise the same constitutional question.

2. The rule heretofore has been that expert evidence was not required if the facts showing negligence were within the understanding of laymen, and the probability of the adverse result from the facts shown was within the common knowledge of laymen. *Sagmiller v. Carlsen*, 219 N.W.2d 885 (N.D.1974).

judgment creditor in regular intervals rather than in a lump sum if the damage award exceeds $100,000. It also provides that

"A judgment entered in the manner provided by this section may be subject to modification or termination on the basis of specified contingencies."

Section 26–40.1–17 provides for suit in district court "without a jury" and "naming the fund as defendant" if the liability insurer agrees to settle its liability by payment of the policy limit of $100,000 and the claimant demands additional payments. It also provides that the fund may stipulate for settlement of the excess claim, with approval by the court if the court is satisfied that the stipulation is reasonable. It is further provided that

"The court, however, shall have continuing jurisdiction over the payments and may order the payments changed as changes in circumstance may dictate."

Section 26–40.1–18 provides:

"In no case shall any payment be ordered from the fund unless payment of one hundred thousand dollars by or on behalf of each liable health care provider shall have been made to the claimant."

## II. PROCEEDINGS IN THE TRIAL COURT

An action was commenced in Burleigh County district court by four physicians. Their amended complaint alleges that the statute is violative of the Equal Protection Clause and due-process provisions of the Fourteenth Amendment to the Constitution of the United States, and Sections 11, 13, 20, and 22 of the Constitution of the State of North Dakota, and that the statute exceeds the police power of the State. They ask for a declaratory judgment of unconstitutionality and a preliminary injunction followed by a permanent injunction.

Documentary evidence, including affidavits and a stipulation, was presented to the trial court, which determined that Chapter 26–40.1 is unconstitutional as violative of the Federal and State constitutional provisions specified in the complaint, and a permanent injunction was granted. This appeal followed.

In the trial an amicus curiae, Bruce Braun, a 25-year-old quadriplegic who is plaintiff in an action for medical malpractice against a North Dakota physician, was allowed to participate. In this court we similarly allowed his attorney to file a brief and participate in oral argument.

## III. THE ISSUES ON APPEAL

The trial court, in determining that the statute is unconstitutional, specified four reasons for so holding, and said that there were many others. We have restated the issues as identified by the trial court and the parties. The first four are restatements of the issues specifically referred to by the trial court, the next four are raised by the appellant State Board of Medical Examiners, and the remainder by the amicus curiae.

1. Is the requirement of malpractice insurance as a prior condition to the right of a previously licensed physician to practice medicine an unreasonable and arbitrary classification, violating the Equal Protection Clauses of the Federal and State Constitutions?

2. Is the requirement of Section 26–40.-1–11, limiting the maximum liability of a physician for medical negligence to $300,000 in malpractice cases only, an invidious discrimination against malpractice victims, violating Federal and State constitutional provisions as to due process and equal protection?

3. If so, does the consent or implied consent or conclusively presumed consent provided for in Section 26–40.1–04 cure the defect?

4. Does Section 26–40.1–07, requiring expert testimony or admission of fault, except in certain specific cases, before recovery can be had for medical negligence, violate the constitutional rights of a victim or alleged victim of malpractice and unconstitutionally invade the power of the courts?

5. Is finding of fact No. 11, that there is no medical insurance problem in North Dakota, supported by evidence?[3]

6. Is the object of Chapter 26–40.1, as expressed in its preamble, reasonably related to the provisions of the statute?

7. Are plaintiffs Arneson and Butler required by the statute to obtain medical malpractice insurance?

8. Are the provisions of Chapter 251, Session Laws 1977, severable?

9. Is Section 26–40.1–05 unconstitutional in limiting the doctrine of informed consent so as to allow recovery only where reasonably prudent persons would not have undergone the treatment had they been properly informed, and requiring informed consent only where information would ordinarily be provided to the patient under like circumstances by health-care providers, thus unreasonably depriving patients of the opportunity to refuse consent and depriving them of the right to information as to proposed procedures except when physicians ordinarily provide such information?[4]

10. Do the requirements of Section 26–40.1–07, requiring expert testimony and limiting the res ipsa loquitur defense in medical-negligence cases violate the constitutional rights of patients?

11. Does the near-elimination of the collateral-source rule by Section 26–40.1–08 violate the constitutional rights of patients?

12. Do the provisions of Section 26–40.1–16, allowing modification or termination of periodic payments, and the provision of Section 26–40.1–17, allowing the changing of payments as changes in circumstances dictate, after the judgment has been entered, violate Sections 20 and 22 of the North Dakota Constitution?

13. Does the provision of Section 26–40.1–18, that no payment be made from the trust fund until $100,000 has been paid by or on behalf of each liable health-care provider, violate the constitutional rights of victims of medical negligence?

## IV. DECISIONS IN OTHER JURISDICTIONS

In recent years, a number of States have reacted to what is described as a "medical malpractice crisis," and have adopted various kinds of statutes in response. Some of these statutes have now reached the courts and have been found constitutional or unconstitutional. None of the statutes to which we have been referred is identical to that of North Dakota, and the attacks on constitutionality have varied from State to State. The cases to which we will refer in this opinion, cited by counsel or discovered by us, include the following decisions of the highest appellate courts of various States as to constitutionality of their various statutes:

*Wright v. Central DuPage Hospital Association,* 63 Ill.2d 313, 347 N.E.2d 736 (1976); *Jones v. State Board of Medicine,* 97 Idaho 859, 555 P.2d 399 (1976); *Carter v. Sparkman,* 335 So.2d 802 (Fla.1976); *Eastin v. Broomfield,* 116 Ariz. 576, 570 P.2d 744 (1977); *State ex rel. Strykowski v. Wilkie,* 81 Wis.2d 491, 261 N.W.2d 434 (1978); *Prendergast v. Nelson,* 199 Neb. 97, 256 N.W.2d 657 (1977); *State ex rel. Schneider v. Liggett,* 223 Kan. 610, 576 P.2d 221 (1978).

In addition, we will refer to the decision of an Ohio trial court in *Simon v. St. Eliza-*

---

**3.** Finding of fact No. 11 reads:

"11. Although over the past years the premiums for professional liability insurance for physicians and surgeons have increased substantially nationwide and in the State of North Dakota, there does not appear to [be] an availability or cost crises [*sic*] in this state."

**4.** Sec. 26–40.1–02, subd. 5:

"5. 'Informed consent' means consent to a procedure based on information which would ordinarily be provided to the patient under like circumstances by health care providers."

Sec. 26–40.1–05:

"Before any claimant may recover damage in any action based on failure to obtain informed consent, the claimant must establish that a reasonably prudent person in the claimant's position would not have undergone the treatment had he been properly informed and that the performance of the treatment was the proximate cause of the injury and damages claimed."

*beth Medical Center,* 3 Ohio Op.3d 164, 355 N.E.2d 903 (Ohio Com.Pl.1976).

For brevity, we will sometimes refer to these cases by the name of the State and a page reference to the National Reporter System report of the decision.

These opinions, none of which is binding upon us, of course, but all of which are entitled to our careful consideration, arrive at various conclusions as to the various statutes construed. The Ohio and Illinois statutes were held unconstitutional, and the Kansas, Nebraska, Florida, Arizona, and Wisconsin statutes were held constitutional. The record in the Idaho case was deemed insufficient to base a determination upon, and the case was remanded for the taking of further evidence, with instructions indicating that constitutionality would be determined under a rule stricter than the ordinary "rational basis" test.

The various opinions are replete with dissents. The Nebraska opinion, especially, is made less persuasive by the fact that the majority opinion is joined by only three of seven judges, with three others dissenting as to the constitutionality of a $500,000 limitation on recovery, and one judge declining to reach constitutional questions, since he questions the standing of some of the parties and concludes that the opinion is only advisory. In Wisconsin three of the seven judges dissent from the finding of constitutionality, and in Illinois two of seven judges dissent from a holding of unconstitutionality.

## V. CONSTITUTIONALITY OF NORTH DAKOTA STATUTE

We now proceed to consider the constitutionality of the North Dakota statute on the basis of North Dakota constitutional law, with such assistance as we are able to derive from the opinions of our sister States when they considered, if they did, the questions raised here.

### A. CLAIM REVIEW PANEL NOT CHALLENGED

We note at the outset that many of the decisions in other States are concerned with the constitutionality of a legislatively established body similar to North Dakota's medical malpractice claim review panel, established by Chapter 305, 1977 Session Laws, and separately codified as Chapter 32–29.1, N.D.C.C. None of the parties before us challenges the constitutionality of North Dakota's medical malpractice claim review panel procedure, and we therefore express no opinion on the subject. Somewhat similar bodies were found to be constitutional in Arizona, Wisconsin, and Nebraska, but unconstitutional in Ohio and Illinois.

### B. CONSTITUTIONAL PROVISION AS TO JUDICIAL POWER VIOLATED

■ Section 87, Constitution of North Dakota, as amended in 1976, provides:

"The supreme court shall have authority to promulgate rules of procedure, including appellate procedure, to be followed by all the courts of this state; and, unless otherwise provided by law, to promulgate rules and regulations for the admission to practice, conduct, disciplining, and disbarment of attorneys at law."

The first clause of the quoted sentence places the authority to promulgate rules of procedure only in the Supreme Court, while the second clause provides that it may promulgate certain rules and regulations unless otherwise provided by the Legislature.

"Procedure" includes pleading and evidentiary matters. *Dyer v. Keefe,* 97 R.I. 418, 423, 198 A.2d 159, 161 (1964); *Hunt v. Rosenbaum Grain Corporation,* 355 Ill. 504, 511, 189 N.E. 907, 911 (1934); *People v. Aguinaldo,* 3 Cal.App.2d 254, 256, 39 P.2d 505, 506 (1934).

■ Section 26–40.1–06 relates to joinder of causes of action against health-care providers qualified under the chapter and others, and provides that no such joinder is to be permitted. Such a provision is a legislative invasion of the constitutional authority of this court to establish rules of procedure. It is therefore void. Our rules of procedure as to joinder are found in Rules 18, 19, 20, and 21, North Dakota Rules of Civil Proce-

dure. They contain no language precluding joinder of health-care providers and others in the same action. In the interest of economy of judicial time and expense to the State and to the parties, we are not disposed to adopt a rule denying joinder. In a typical medical-negligence case, the defendants may very well include hospitals, nurses, nurse-anesthetists, and physicians who are qualified, as well as physicians not qualified under Chapter 26–40.1, N.D.C.C. Adoption of a rule similar to Section 26–40.-1–06 would require a duplication or multiplication of evidence and a duplication or multiplication of expense, which does not appear to us to be justified.

■ Similarly, Section 26–40.1–07 attempts to severely limit the doctrine of res ipsa loquitur, heretofore held applicable in medical-negligence cases in this State. *Swanson v. Hill,* 166 F.Supp. 296 (D.N.D. 1958); *Sagmiller v. Carlsen,* 219 N.W.2d 885 (N.D.1974). It has also been held, under the law of this State, that expert testimony is not necessary to establish a duty, the breach of which is a blunder so egregious that a layman is capable of comprehending its enormity. *Walker v. North Dakota Eye Clinic, Ltd.,* 415 F.Supp. 891 (D.N.D.1976). See also fn. 1.

The admissibility of evidence is a matter for the determination of this court. We hold that the attempted legislative establishment of rules as to joinder and admissibility of evidence in Sections 26–40.1–06 and 26–40.1–07, N.D.C.C., is unconstitutional.

## C. POLICE POWER PERMITS REASONABLE REGULATION OF PREVIOUSLY LICENSED PROFESSIONALS

■ The four physicians who commenced the present action argue that a requirement by statute that previously licensed physicians furnish evidence of professional liability insurance and participate in the patient's trust fund, or lose their licenses if they fail to do so, violates "the concept of substantive due process" and constitutes an improper exercise of the police power of the

State. In a very recent case, *Johnson v. Elkin,* 263 N.W.2d 123, 130 (N.D.1978), we said:

"We conclude that there is no general constitutional prohibition against legislation limiting entry into occupations or professions. Any occupation or profession may be subject to the police power. The only question is whether the regulation, as to entry into the occupation or profession or otherwise, is reasonable and, within constitutional limits, promotes the order, safety, health, morals and general welfare of society. [Citation omitted.]"

The rule is the same as to continuance of a profession or occupation after the original entry. Reasonable regulation is still permissible.

We discuss the due-process question below.

## D. STANDARDS OF CONSTITUTIONAL SCRUTINY

We turn now to standards to be applied to our determination of the questions of equal protection and due process.

■ The original plaintiffs are within permissible bonds in asking us to rule on the substantive due process of the statute. As we pointed out in *Johnson v. Hassett,* 217 N.W.2d 771 (N.D.1974), and *Johnson v. Elkin, supra,* North Dakota has never renounced substantive due process as a constitutional standard, while the Federal courts had made such a renunciation for a long period after 1937, but seem to be hesitantly returning to the standard of late. See, for example, *Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); and *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977).

In *Johnson v. Hassett, supra,* we referred to the three standards of scrutiny of equal-protection questions for a judicial adjudication of constitutionality which appeared to have evolved in the Federal courts. One is the traditional reasonable or rational-basis

standard under which a statute will be upheld if its classifications are not patently arbitrary and bear a reasonable relationship to a legitimate government interest. However, if the case involves an "inherently suspect classification" or a "fundamental interest," it is "subjected to strict judicial scrutiny." A third, less clearly defined, category requires a "close correspondence between statutory classification and legislative goals." In *Johnson v. Hassett, supra,* we said that this latter test closely approximates the substantive due-process test historically used by this and other State courts. It is the test we used in *Johnson v. Hassett, supra,* which has many similarities to the present case. *Johnson v. Hassett* involved the constitutionality of the automobile guest statute, which limited recovery in tort for automobile guests by application of a test which was inapplicable to other tort victims, including paying guests riding in automobiles. It is the test we will apply in this case, and it is the test applied by the Idaho court. Just as we will do below, the Idaho court independently examined the basis for the legislative justification for the Act in question. See 555 P.2d pages 407 and 411 of the Idaho opinion.

The Wisconsin, Kansas, and Nebraska courts applied the rational-basis test.

■ As to the application of due-process principles in cases where the police power is asserted, the test is whether the State acts in an arbitrary or unreasonable manner. *Menz v. Coyle,* 117 N.W.2d 290 (N.D.1962); *Johnson v. Elkin, supra.*

## E. APPLICATION OF STANDARDS TO ACT IN QUESTION

We have briefly noted above some of the ways in which Chapter 26–40.1, N.D.C.C., modifies previous law. These include a limitation of recovery to $300,000 [Sec. 26–40.1–11], which will be discussed below. Section 26–40.1–08 abolishes the collateral-source doctrine, previously approved by this court in *Ostmo v. Tennyson,* 70 N.D. 558, 296 N.W. 541 (1941), and *Regent Cooperative Equity Exchange v. Johnston's Fuel Liners, Inc.,* 122 N.W.2d 151 (N.D.1963).

The new statute will allow the tortfeasor to have the advantage of nonrefundable insurance benefits purchased by or for the injured plaintiff, except for refund of five years' premiums. Another change relates to the doctrine of informed consent, under which heretofore a physician was liable for negligent acts or omissions undertaken without first obtaining the informed consent of the patient. Under Sections 26–40.1–05 and 26–40.1–02, subdivision 5, the test of liability for failure to obtain informed consent is changed from a subjective right of the patient to refuse consent to an objective determination of whether a reasonably prudent person would have undergone the treatment had he been properly informed, and requiring information only to the extent that such information "would ordinarily be provided to the patient under like circumstances by health care providers."

Thus the custom of health-care providers becomes the standard as to what information should be given, and the right to refuse is determined not by the will of the patient but by the determination of a jury as to what a reasonably prudent person would have done.

The Legislature attempted to meet some of the anticipated constitutional objections to Chapter 26–40.1 by providing that it applied only to patients who "consented" to its provisions. Section 26–40.1–04 provides that a patient or his representative (parent, guardian, attorney, spouse, trustee, personal representative, or other legal agent) elects to be bound by signing an acknowledgment of consent on forms to be furnished by the Commissioner. Other provisions are summarized in the early part of this opinion. It is provided that "In the event a patient does not consent pursuant to this section, the physician shall decide whether he will or will not provide services to the patient." It is further provided that "In the event emergency treatment is required, such person is subject to the terms and provisions of this chapter." Thus it is conclusively presumed that an unconscious patient or other patient requiring emergency care consents to treatment, but in the

absence of consent by a nonemergency patient, the physician is under no obligation to provide any care at all. The only choices available to the patient who is refused care apparently are to suffer or die of his ailment or to travel outside the State to obtain medical attention.

We do not hold that tort liability may never be waived by contract,[5] but we will consider the apparent harshness of the provision we have outlined as one of the factors to be used in determining whether due process and equal protection are violated.

The foregoing list is not exhaustive.

We have no doubt that the Legislature has the authority to modify pre-existing law in some of the respects we have mentioned. However, the overall extent and effect of such modifications are matters which we may consider in arriving at our ultimate determination as to whether the statute is arbitrary or unreasonable and violates due process, and whether there is a close correspondence between statutory classifications and legislative goals, or whether equal protection is violated by the lack of such correspondence.

We now turn to the question of whether the requirement of $100,000 insurance and participation in a fund to create excess coverage to $300,000 is violative of due process. The Idaho court, page 408, held that due process was not violated. The Kansas court made a similar holding. But these decisions are not as persuasive as they might be, since the Idaho statute has a provision under which physicians unable to obtain insurance may be exempted [I.C. § 39–4211], and the Kansas plan provides for "an apportionment plan whereby any health care provider may obtain liability insurance from the plan if insurance from a conventional source (40–3413) is not available." 576 P.2d page 224. The North Dakota statute contains no similar provisions. The nearest approach in the North Dakota procedure is a special rule promulgated by the defendant

Board of Medical Examiners which provides for a special license which the Board may grant "in the best interests of the State" to "special applicants." No standards are specified for action by the Board of Medical Examiners; no statutory authority for the issuance of such a special license is apparent; and the term "special applicants" is nowhere to be found in the statute. We have serious doubts as to the authority of the Board of Medical Examiners to issue such licenses, but, since the matter was not briefed and argued, we express no opinion at this time.

A compulsory insurance statute affecting physicians was held unconstitutional in *McGuffey v. Hall*, 557 S.W.2d 401 (Ky.1977), even though the Kentucky Act contained provisions for self-insurance not present in the North Dakota Act.

We express serious doubts as to the reasonableness of the statutory scheme which requires insurance but does not provide for those unable to obtain insurance an alternative means for obtaining the equivalent of insurance, as applied to persons licensed to engage in a profession. In view of our holdings later in this opinion, we do not decide the question at this time.

We note, in passing, that some of the other States provide methods for providing equivalent protection, other than insurance, sometimes similar to the assigned-risk plan for insuring uninsured motorists in North Dakota [Sec. 26–41–19, N.D.C.C.], and qualification as a self-insurer under the Auto Accident Reparations Act [Chap. 26–41, N.D.C.C.] and the Financial Responsibility Law [Chap. 39–16, N.D.C.C.].

We do not hold, or even suggest, that no right may be limited or withdrawn without providing a quid pro quo. Ohio says that such a quid pro quo must be given [355 N.E.2d page 910], but Idaho [555 P.2d page 409], Wisconsin [261 N.W.2d pages 447–448], and Nebraska [256 N.W.2d page 671] disagree. The United States Supreme

---

5. For cases holding that some contractual provisions to limit tort liability will not be enforced, see *Tunkl v. Regents of University of California*, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441 (1963), relating to an attempted contractual limitation of liability of a hospital to a patient; Dooley, Modern Tort Law, § 25.02; and Prosser on Torts, 4th Ed., § 67.

Court recently expressed doubt that a quid pro quo was required when a tort remedy was replaced but did not decide the question, holding that a quid pro quo was provided. *Duke Power Co. v. Cardina Environmental Study Group*, —— U.S. ——, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

■ However, we agree with the Illinois court [347 N.E.2d page 743] that while there need not always be a quid pro quo, any limitation or elimination of a pre-existing right may not be arbitrarily imposed.

## F. LIMITATION ON RECOVERY VIOLATES EQUAL PROTECTION

We come now to the constitutionality of the maximum figure of $300,000 arising from any one occurrence.

It is common knowledge that some severely injured persons have normal life expectancies. Some of them require care around the clock. It seems obvious that the total expense of caring for a young person in a coma, or a quadriplegic, during a normal life expectancy might well exceed $300,000. In the face of such facts, we must examine the stated basis for the imposition on the limitation of recovery to $300,000.

Preliminarily, we note that no State court of last resort has upheld a limitation so low. Nebraska upheld a $500,000 limitation, but Illinois held that a $500,000 limitation was unconstitutional as arbitrary and as a special law [347 N.E.2d pages 742–743]. In Idaho a limitation on recoverable damages for actions against physicians of $150,000 per claim and $300,000 per occurrence is specified. However, the Idaho court remanded the case for further factual basis for a determination as to whether the means adopted were reasonably related to the solution of the problems asserted by the Legislature.

In Wisconsin there appears to be no limit presently for recovery, but only a limit of $500,000 of payments *per year* if the award is over $1,000,000. The Wisconsin statute provides that after July 1, 1979, there shall be a limit of recovery of $500,000 *over and above medical expenses*, and only if the State fund falls below a certain level. Yet the Wisconsin Supreme Court held that it would be "judicially inappropriate" to decide in 1977 whether the provision effective in 1979 was constitutional. In Kansas there apparently is no limit of recovery.

We proceed to a determination of whether the legislative limitation of recovery is arbitrary and unreasonable and violative of due process, or whether there is a sufficiently close correspondence between statutory classification and legislative goals so as not to violate the equal-protection requirements of the State and Federal Constitutions.[6]

At the beginning of this opinion we quoted the preamble of the statute, containing its legislative purposes. These include assurance of availability of competent medical and hospital services at reasonable cost, elimination of the expense involved in nonmeritorious malpractice claims, provision of adequate compensation to patients with meritorious claims, and the encouragement of physicians to enter into practice in North Dakota and remain in such practice so long as they are qualified to do so.

Does the limitation of recovery of seriously damaged or injured victims of medical negligence promote these aims? We hold that it does not and that it violates the Equal Protection Clause of the State Constitution. Certainly the limitation of recovery does not provide adequate compensation to patients with meritorious claims; on the contrary, it does just the opposite for the most seriously injured claimants. It does nothing toward the elimination of nonmeri-

**6.** *Duke Power Co.*, supra, is of no assistance, since the United States Supreme Court found a limitation of recovery on damages from a nuclear accident was justified because of the "extremely remote possibility of an accident where liability would exceed the limitation" of $560 million, and a commitment by Congress to

"take whatever action is deemed necessary and appropriate to protect the public from the consequences of" any such disaster was "within permissible limits and not violative of due process." Here, we have a strong possibility of damages above the limitation and no legislative commitment beyond the limitation.

torious claims. Restrictions on recovery may encourage physicians to enter into practice and remain in practice, but do so only at the expense of claimants with meritorious claims. We agree with the Illinois court where it says:

". . . Furthermore, the very seriously injured malpractice victim, because of the recovery limitation, might be unable to recover even all the medical expenses he might incur, in which event he would recover nothing for any other loss suffered.

"Defendants argue that there is a societal *quid pro quo* in that the loss of recovery potential to some malpractice victims is offset by 'lower insurance premiums and lower medical care costs for all recipients of medical care.' This *quid pro quo* does not extend to the seriously injured medical malpractice victim and does not serve to bring the limited recovery provision within the rationale of the cases upholding the constitutionality of the Workmen's Compensation Act. [347 N.E.2d page 742]

". . . We are of the opinion that limiting recovery only in medical malpractice actions to $500,000 is arbitrary and constitutes a special law in violation of section 13 of article IV of the 1970 Constitution, and we so hold." 347 N.E.2d at 743.

When we examine the legislative purpose of the Act, we find that the incidence of malpractice claims in North Dakota is far lower than the average in the United States. The Legislature was advised that malpractice insurance rates were determined on a national basis, and did not take into account the state-wide experience of smaller States such as North Dakota. Thus premiums were unjustifiably high for States such as North Dakota with fewer claims and smaller settlements and judgments.

The evidence in the case before us, however, indicates that either the Legislature was misinformed or subsequent events have changed the situation substantially. Evidence in the present case shows that one of the largest insurance companies is accepting applications for malpractice insurance in North Dakota, and using rates lower than the national averages.

One comparison of rates given to the Legislature shows that premiums in North Dakota are the sixth lowest in the United States.

■ Based upon these facts, and others of the same import, the trial court made a finding that there did not appear to be an availability or cost crisis in this State. We cannot say that this finding is clearly erroneous, based upon the evidence in this case.

■ In the absence of such a finding of crisis, and in view of the drastic limitation on recovery, we conclude that the $300,000 limitation on recovery in malpractice cases is a violation of the equal-protection provision of the North Dakota Constitution, Section 20. It is likewise violative of the similar provision of the Fourteenth Amendment to the United States Constitution.

## G. WHETHER CHAPTER 26–40.1 IS SPECIAL LEGISLATION NOT DECIDED

A further challenge to the constitutionality of Chapter 26–40.1 is based upon the provisions of Sections 69 and 70 of the Constitution of North Dakota. Section 69 provides that the Legislative Assembly shall not pass special or local laws in any of thirty-five specified categories, and Section 70 provides:

"In all other cases where a general law can be made applicable, no special law shall be enacted; nor shall the legislative assembly indirectly enact such special or local law by the partial repeal of a general law, but laws repealing local or special acts may be passed."

The Illinois court held that a provision in its Constitution similar to Section 69 was violated by its Act regulating malpractice claims, while Idaho held that its similar

provision was not violated. However, Idaho's Constitution apparently lacks language equivalent to Section 70.

In view of our determination of this case on other grounds, we need not decide whether the legislation violates Sections 69 and 70 of the Constitution of North Dakota.

## H. MODIFICATION OF JUDGMENTS, IF JUDGMENT PERMITS, NOT UNCONSTITUTIONAL

 We believe that the foregoing discussion disposes of all of the questions raised except No. 7, No. 12, and No. 13. As to No. 12, we understand the last sentence of Section 26–40.1–16, relating to modification or termination of judgments on the basis of specified contingencies, to refer only to judgment provisions ordering payments at regular intervals rather than in a lump sum. As so construed, we find no constitutional objection to modification or termination on the basis of contingencies stated in advance in the original judgment itself. As to No. 13, the parties suggest that a jury might find two defendants liable, one for more than $100,000 and the other for less. Under the statute, applied blindly, the excess over $100,000 of the larger sum would not be payable because "payment of one hundred thousand dollars" would not have been made by the other. We do not reach this issue in view of our holding of unconstitutionality of the Act as a whole.

For the same reason, we do not reach question No. 7.

## I. UNCONSTITUTIONAL DENIAL OF JURY TRIAL

 As to Section 26–40.1–17, we believe it constitutes an unconstitutional deprivation of the right to a jury trial, insofar as it provides that if the insurer under the basic policy of insurance pays its policy limit of $100,000 and the claimant is dissatisfied, he must sue, naming the fund as defendant, and have his case tried without a jury. The right to a jury trial is a basic right in this State. The right to a jury trial remains inviolate. Sec. 7, Const. of N.Dak.; and see *Landers v. Goetz*, 264 N.W.2d 459 (N.D.1978).

## J. ACT AS A WHOLE VIOLATES DUE PROCESS

 Although some of the following provisions of the Act, individually, would not violate due process, we hold that the cumulative effect of the limitation of the application of the Act to only one category of health-care professionals [Sec. 26–40.1–02], the arbitrary requirement of consent under conditions of duress and statutory imposition of "consent" in emergencies [Secs. 26–40.1–03 and 26–40.1–04], the limitation on use of the doctrine of res ipsa loquitur [Sec. 26–40.1–07], and the near-abolition of the collateral-source doctrine [Sec. 26–40.1–08] is to violate the right of medical patients in this State to due process of law. We find that the statute is, in respect to these matters, arbitrary and unreasonable and discriminatory, and that the methods adopted have no reasonable relation to the attainment of the results desired. *Menz v. Coyle, supra.*

## K. CHAPTER 26–40.1 AS A WHOLE UNCONSTITUTIONAL

 Having concluded that several parts of Chapter 26–40.1 are unconstitutional, we are now faced with the necessity of deciding whether the entire Act is unconstitutional or whether the remaining parts of the statute are valid. We have consistently held that the declaration of part of a law as unconstitutional does not require the courts to declare the remainder void also, unless all provisions are so connected and dependent upon each other that it cannot be presumed that the Legislature would have enacted the valid sections without the unconstitutional sections. Section 1–02–20, N.D. C.C., provides that a judgment declaring the invalidity of part of a statute does not invalidate other parts of the statute.

We have examined Chapter 26–40.1 as it would stand after striking from it those sections declared unconstitutional in this opinion, and we have concluded that the Legislature would not have enacted the Act without those provisions declared unconstitutional, and in particular without Section 26–40.1–11, and we therefore declare the entire Chapter 26–40.1 unconstitutional. See *Montana-Dakota Utilities Co. v. Johanneson*, 153 N.W.2d 414 (N.D.1967).

Judgment affirmed.

SAND, Acting C. J., and PAULSON, J., and BURDICK and HEEN, District Judges, concur.

BURDICK and HEEN, District Judges, sitting for ERICKSTAD, C. J., and PEDERSON, J., disqualified.