**Dennis C. WAGGONER, as Guardian of the Estate and Person of John M. Waggoner**

**v.**

**Burney GIBSON, M.D. and Presbyterian Medical Center, d/b/a Presbyterian Hospital of Dallas.**

**No. CA 3–84–1725–R.**

United States District Court,
N.D. Texas,
Dallas Division.

Sept. 29, 1986.

G. Duffield Smith, Jr. and Jess C. Rickman, III, Gardere & Wynne, Dallas, Tex., for plaintiff.

William T. Hankinson, Thompson & Knight, Dallas, Tex., for Gibson.

Gerald W. Benson, Tobolowsky, Prager & Schlinger, Dallas, Tex., for Presbyterian Hosp.

MEMORANDUM OPINION

BUCHMEYER, District Judge.

This is a medical malpractice case.

It is undisputed that the plaintiff, John Waggoner, suffered severe injuries—permanent brain damage that will leave him totally disabled for the rest of his life—as the result of events which took place during a "routine" operation on his knee in May of 1983. Through his father and guardian, Dennis Waggoner, he seeks substantial damages.[1]

However, because of the Medical Liability and Insurance Improvement Act, Tex. Rev.Civ.Stat.Ann. art. 4590i, sections 11.-02–11.04 (Vernon Supp.1986) ("the Act"), Waggoner will not be able to recover more than $500,000—even if he establishes, at trial, that the negligence of the defendants caused his injuries (a matter that is denied, and vigorously contested, by both defendants).

For the reasons explained below, this Court—like the three intermediate appellate courts of Texas that have considered this issue—holds that the Act is unconstitutional under both the federal and state constitutions. Accordingly, Waggoner—and other plaintiffs in medical malpractice cases in Texas—will not, if their evidence warrants, be limited to a maximum recovery of $500,000.

### 1. *The Facts*

John Waggoner was admitted to Presbyterian Hospital in Dallas on May 5, 1983, for non-emergency surgery on his right knee. That evening, the defendant Burney Gibson, a board-certified anesthesiologist, met with Waggoner. It is disputed whether or not Dr. Gibson explained to Waggoner the "specific risks, hazards, and complications" involved with the anesthesia to be used, particularly in view of Waggoner's asthmatic condition. In the operating room on the following day, Dr. Gibson administered a spinal block anesthetic—using, in

1. He has rejected an Offer of Judgment under Rule 68, Fed.R.Civ.P., *for more than $800,000.*

part, respiratory depressants, including morphine, valium, fentanyl, and droperidol. Shortly after the operation began, Waggoner's breathing ceased and he experienced a cardiac arrest. Although he was resuscitated in 6–10 minutes, Waggoner remained in a coma for several months. He suffered severe and irreversible damage to his brain and nervous system, and is totally disabled.

This malpractice suit was filed on October 9, 1984. There is diversity jurisdiction under 28 U.S.C. section 1332(a)(1). Waggoner alleges that Dr. Gibson was negligent "before, during and after the anesthesia procedure." He also claims that the defendant Presbyterian Hospital is "vicariously liable for the negligence of Dr. Gibson" because the anesthesiologist was "the apparent or ostensible agent of Presbyterian Hospital." Because he will be totally disabled for life, Waggoner seeks to recover damages well in excess of $800,000 from the defendants. (See footnote 1.)

### 2. *The Act*

However, the Texas legislature has placed a $500,000 limit on recovery of damages by plaintiffs in malpractice suits in this state, including John Waggoner. In doing so, the legislature "found" that the

number of malpractice suits has increased "inordinantly," as has the amount of money paid by insurers in judgments and settlements; and that this "situation has created a medical malpractice insurance crisis in the State of Texas." Act, section 1.02(a)(1), (3), & (5). The actual existence of such a crisis in Texas is, however, a matter of some debate.[2]

Although the Act states an intention not to "unduly restrict a claimant's rights any more than necessary to deal with the crisis," Act, section 1.02(b)(3), it raises no distinctions between malpractice victims to whom $500,000 would be a boon and those to whom $500,000 would barely be a beginning. *See* Act, section 11.02; *see also* Act, section 11.03 (alternative limitation in case 11.02 is stricken). Its statement of purpose does not explain why the only legislative response to the insurance "crisis" is to limit the recoveries of malpractice claimants with the most meritorious and substantial suits, and is silent as to other conceivable avenues of investigation[3]—including questions of whether the increases in insurance cost are, in fact, caused solely by increased litigiousness among patients rather than the quality of investments made by the insur-

---

**2.** *See* Witherspoon, *Constitutionality of the Texas Statute Limiting Liability for Medical Malpractice,* 10 Tex.Tech.L.Rev. 419, 446 (1979) (concluding that nine states do have such crises, but that Texas does not); *cf.* Redish, *Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications,* 55 Tex.L.Rev. 759 (1977) (study funded by American Hospital Association urging judicial restraint, but not considering Texas "crisis" separately). Indeed, one of the legal profession's foremost empirical analysts has concluded that the entire "litigation explosion" that has precipitated "tort reform" measures (like the Medical Liability and Insurance Improvement Act of Texas) is nonexistent. *See* Galanter, *Reading the Landscape of Disputes: What We Know and Don't Know (and Think We Know) About Our Allegedly Contentious and Litigious Society,* 31 U.C.L.A.L. Rev. 4 (1983). Galanter's conclusions are borne out by the only comprehensive studies on tort litigation that have been accomplished. *See* Trubek, Grossman, Felstiner, Kritzer & Sarat, Civil Litigation Research Project, Final Report (March 1983), *described in* Trubek, Sarat, Felstiner, Kritzer & Grossman, *The Costs of Ordinary Litigation,* 31 U.C.L.A.L.Rev. 73 (1983); *see also* Ad-

ministrative Office, U.S. Courts, Annual Report of the Director A–6 (1985) (tort cases are only 17 percent of caseload) *and* Danzon, The Frequency and Severity of Medical Malpractice Claims (Rand Corp. 1982) (claims have increased by only 3.5 percent per year).

**3.** The social wisdom of the legislature's policy choices is, of course, irrelevant to the question of constitutionality of the Act. Complete disregard for other potential policy options is, however, of at least tangential relevance when considering whether a legislative or administrative goal is a legitimate one. *See, e.g., Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Ins. Co.,* 463 U.S. 29, 46–48, 103 S.Ct. 2856, 2868–69, 77 L.Ed.2d 443 (1983); *United Church of Christ v. Federal Communications Comm'n,* 779 F.2d 702, 712 (D.C.Cir.1985). At least one court has found that the "spiraling increases in the costs of medical care since the enactment of the statute" indicates that other causal factors may be behind the "malpractice insurance crisis." *See Detar Hospital, Inc. v. Estrada,* 694 S.W.2d 359, 366 (Tex.Civ.App.—Corpus Christi 1985, no writ).

ance industry, and whether increases in premiums are, in fact, warranted by existing market conditions.[4] Nor does the Act address only non-meritorious claims. The limitation of damages that may be recovered in *all* malpractice cases, regardless of merit, is the sole response of the legislature to the putative "crisis."

### 3. *The Law*

Each Texas court considering the Act has found its limitations on recovery to constitute impermissible limitations on the constitutional protections afforded malpractice litigants. In *Baptist Hospital of Southeast Texas v. Baber*, 672 S.W.2d 296 (Tex.Civ.App.—Beaumont 1984, writ ref'd n.r.e.), the court found that the Act violated equal protection as "the limitation of recovery does not provide adequate compensation to patients with meritorious claims; on the contrary, it does just the opposite for the most seriously injured claimants. It does nothing toward the elimination of non-meritorious claims." *Id.* at 298, *quoting Arneson v. Olson*, 270 N.W.2d 125, 135–36 (N.D.1978). In *Detar Hospital, Inc. v. Estrada*, 694 S.W.2d 359 (Tex.Civ.App.—Corpus Christi 1985, no writ), the court found that the Act violated the equal protection clauses of both the federal and state constitutions, as well as the "open-courts" provision of the Texas constitution. *See id.* at 365–66. Finally, the court in *Malone & Hyde, Inc. v. Hobrecht*, 685 S.W.2d 739

(Tex.Civ.App.—San Antonio 1985, no writ), followed *Baber* and extended the finding of unconstitutionality to "a corporation operating a pharmacy even if it qualifies as a health care provider" under the Act. Although the Texas Supreme Court has not yet addressed this issue, each Texas court court considering the constitutionality of the Act has, therefore, found it invalid.

Of the six other states which have considered the constitutionality of malpractice limitation statutes, two have upheld the statutes—but four have joined Texas in finding them to be invalid. *See Fein v. Permanente Medical Group*, 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d 665 (1985) (upholding statute); *Johns on v. St. Vincent Hospital, Inc.*, 273 Ind. 374, 404 N.E.2d 585, 598–601 (1980) (upholding statute); *cf. Carson v. Maurer*, 120 N.H. 925, 941–43, 424 A.2d 825, 836–38 (1980) (striking statute down); *Arneson v. Olsen*, 270 N.W.2d 125, 135–136 (N.D.1978) (striking statute down); *Simon v. St. Elizabeth Medical Center*, 3 Ohio Op.3d 164, 166, 355 N.E.2d 903, 906–07 (1976) (striking statute down); *Wright v. Central DuPage Hospital Ass'n*, 63 Ill.2d 313, 347 N.E.2d 736 (1976) (striking statute down).

### (a) *Equal Protection*

In the absence of a resolution of this conflict from the United States Supreme Court,[5] or of a determination by the Texas Supreme Court,[6] this Court will fol-

---

**4.** *Cf. Report of the Tort Policy Working Group on the Causes, Extent, and Policy Implications of the Current Crisis in Insurance Availability and Affordability* (Washington, D.C.: General Accounting Office, February 1986) (finding that increases in 1984 malpractice premiums went far beyond requirements of profitability); *see also* Kirchner, *Is Your Practice Begging for More Money?*, MEDICAL ECONOMICS 230 (Nov. 12, 1984) (highest-risk group [neurosurgeons] spends only 5.8 percent of income on malpractice insurance) *and* Danzon, EVALUATION OF THE CURRENT MALPRACTICE SYSTEM (presentation to Urban Institute's National Medical Malpractice Conference, 1985) (in 1982, premiums averaged 1–6 percent of physician gross income).

**5.** The Supreme Court has been urged to resolve the conflict among state courts, but has refused to do so. *See Fein v. Permanente Medical*

*Group*, —— U.S. ——, 106 S.Ct. 214, 215, 88 L.Ed.2d 215 (1985) (White, J., dissenting from the dismissal of appeal).

**6.** The Texas Supreme Court granted review in *Baber*, but, almost two years later, declined to address the constitutional issue and denied the writ with "no reversible error." In its *per curiam* opinion, the court noted that the amount awarded by the jury did not exceed the permissible amount under the statute, adjusted for inflation. Although it might be preferable for a federal district court to allow the highest court of a state to rule on the constitutionality of an act of that state's legislature, the disposition of all malpractice cases cannot be indefinitely delayed in the interim. *See Brownsville Medical Center v. Gracia*, 704 S.W.2d 68, 80 (Tex.Civ. App.—Corpus Christi 1985, no writ). Moreover, even though the court expressly declined to

low the unanimous view among the Texas appellate courts and the more persuasive reasoning of the state courts in New Hampshire, North Dakota, Ohio, and Illinois. Accordingly, the Texas Act is unconstitutional because it violates the equal protection clauses of both the federal and the state constitutions. U.S. CONST. amend. XIV; *TEX. CONST.* art. 1, section 3.

■ In subjecting malpractice damage limitations to equal-protection analysis, courts apply a rational relationship test with due-process underpinnings. Because classifications based on the right to recover in tort do not involve fundamental textual constitutional rights or suspect classes, stricter standards of review are not appropriate; however, application of the rational relationship test is not "an all but certain indication of validity" for malpractice statutes.[7] The applicable equal-protection standards require "some rational relationship to legitimate state purposes." *San Antonio School District v. Rodriquez*, 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973); *Silva v. Vowell*, 621 F.2d 640, 647 (5th Cir.1980); *Baker v. Wade*, 553 F.Supp. 1121, 1143 N.D.Tex.1982), *supplemented*, 106 F.R.D. 526 (N.D.Tex.1985), *appeal dism'd*, 743 F.2d 236 (5th Cir.1984), *re v'd en banc on other grounds*, 769 F.2d 289 (5th Cir.1985), *cert. denied*, — U.S. ——, 106 S.Ct. 3337, 92 L.Ed.2d 742 (U.S. July 7, 1986). The test requires, then, a "legitimate state interest" to rationalize a denial of equal protection. *See Baker v.*

*Wade*, 553 F.Supp. at 1145. This Court concurs with the three Texas courts and with the reasoning in *Arneson*, 270 N.W.2d at 135–36, that limiting the recovery of the most deserving victims of malpractice is not a legitimate interest of the state, and, moreover, that this goal deprives such victims of due process of law.

■ The legitimacy of imposing recovery limitations on only the most severely injured victims of malpractice[8] is undermined by a lack of a societal *quid pro quo* for the displacement of the victims' common-law right of recovery. *See Baber*, 672 S.W.2d at 298 and *Estrada*, 694 S.W.2d at 366; *see also Arneson*, 270 N.W.2d at 135 (North Dakota), *Carson*, 424 A.2d at 837 (New Hampshire), *Simon*, 355 N.E.2d at 909–910 (Ohio), *Wright*, 347 N.E.2d at 742–43 (Illinois); *see generally Duke Power v. Carolina Environmental Study Group*, 438 U.S. 59, 88, 98 S.Ct. 2620, 2638, 57 L.Ed.2d 595 (1978) (due process may require that a legislatively enacted compensation scheme provide a reasonable substitute remedy for displacing a remedy at common law); *New York Central R.R. Co. v. White*, 243 U.S. 188, 201, 37 S.Ct. 247, 252, 61 L.Ed. 667 (1917).

A statutory "limitation of recovery does not provide adequate compensation to patients with meritorious claims; on the contrary, it does just the opposite for the most seriously injured claimants. It does noth-

---

reach the constitutional issue, the denial of review with "no reversible error" has been held to lend "precedential weight to the value of the published opinion of the court of appeals." *Helms v. Soutwestern Bell*, 794 F.2d 188, 194 n. 14 (5th Cir.1986), *quoting* Robertson & Paulsen, *Rethinking the Texas Writ of Error System*, 17 TEX.TECH.L.REV. 1 (1986). Of course if this case is appealed, the question may be certified by the Fifth Circuit to the Texas Supreme Court. Tex. Const. art. V, section 3–c(a).

7. *See* Redish, *supra*, at 770–771 nn. 72 & 80 (citing himself for the proposition that the rational relationship test requires a sort of political-question abstention in favor of "democratic political bodies"). Indeed, courts in at least five states, including three separate judicial districts in Texas, have disagreed and found malpractice

statutes constitutionally invalid under the rational relationship test.

8. It is beyond doubt that the Texas statute operates against only those malpractice victims who are most severely injured; the plaintiff in this case (if his claims are proven at trial) provides a fitting paradigm. A blanket limitation means that a jury could award damages of up to the statutory limit to an only slightly injured patient, but a patient who is permanently and severely disabled would be entitled to no greater recompense. The slightly injured patient is, thus, not affected by the statute—while the most severely injured patient is greatly handicapped by it. The Act thus discriminates not only between classes of tort victims, but also between serious and non-serious classes of malpractice victims.

ing toward the elimination of nonmeritorious claims." *Arneson,* 270 N.W.2d at 135–36, *quoted in Baber,* 672 S.W.2d at 298, *and Estrada,* 694 S.W.2d at 366; *see also ante* n. 6.[9] Because the "wide-sweeping, absolute limitation on liability found in the Act (art. 4590i) is an unreasonable infringement on a plaintiff's constitutionally protected right to obtain full redress for injuries caused by another's wrongful conduct," *Estrada,* 694 S.W.2d at 366, the legislative goal is not a legitimate one; the discrimination between classes of litigants created by the Act is thus invalid. The limitations on recovery—both the $500,000 maximum of section 11.02(a) and the "alternative partial limit" of $150,000 of section 11.03 [10]—are unconstitutional because they violate the equal protection provisions of both the United States and the Texas Constitutions.[11]

■ This result is not vitiated by the existence of a malpractice insurance "crisis." Even assuming that such a "crisis" has a basis in fact, it is indisputable that constitutional protections are not suspended in time of even the most legitimate crises. *See Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 589, 72 S.Ct. 863, 867, 96 L.Ed. 1153 (1952) (constitutional provisions exist "in good and bad times"); *cf. Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (since-discredited internment of Japanese descendents during war); *Konigsberg v. State Bar,* 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957) (fear of communism). Constitutional protections exist for litigants regardless of market conditions for insurance companies and the medical industry; concerns about the latter cannot be allowed to overrun the former at the expense of those who prove at trial that they were most seriously injured by acts of malpractice.

(b) *Open Courts Provision*

■ In addition to the equal protection clauses, there is an independent state ground for striking down limits on malpractice recovery—the open-courts provision of the Texas constitution.[12] That pro-

---

**9.** The contrary argument is found in *Fein v. Permanente Medical Group,* 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d 665 (1985); the court there found that a *quid pro quo* did exist—that "the preservation of a viable medical malpractice insurance industry" was an adequate benefit that justified the additional detriment placed on the most serious malpractice victims. *See id.* at 160 n. 18, 211 Cal.Rptr. at 385 n. 18, 695 P.2d at 681–82 n. 18. This Court rejects this view, as have all Texas courts of appeals interpreting the Act.

**10.** The "alternative partial limit" of section 11.03 —a $150,000 limit on recovery in malpractice cases "for all past and future noneconomic losses," such as physical pain and suffering, mental anguish, consortium, and disfigurement—is to become effective in the event the $500,000 limit of section 11.02 is invalidated. Both sections, of course, suffer from the same constitutional infirmities.

**11.** This result is not limited solely to hospitals, as in *Baber* —where the result was limited only because a hospital was the sole defendant. *See id.* 672 S.W.2d at 298. This is not the case here, and limits on malpractice recovery are removed both as to the defendant hospital and the defendant physician.

**12.** Other sections of the Act, notably the limitations period for filing suit, have been the subject of open-courts challenges in the Texas Supreme Court and the courts of appeals. *See Morrison v. Chan,* 699 S.W.2d 205 (Tex.1985) (upholding constitutionality of limitations when plaintiff could have discovered injury within two years), *aff'g* 668 S.W.2d 483 (Tex.Civ.App.—Ft. Worth 1984) (*en banc* ); *Neagle v. Nelson,* 685 S.W.2d 11 (Tex.1985) (finding limitation period unconstitutional when sponge left in body could not have been discovered), *aff'g* 658 S.W.2d 258 (Tex.Civ.App.—Corpus Christi 1983); *Nelson v. Krusen,* 678 S.W.2d 918 (Tex.1984) ("How is the impossible condition placed on the Nelsons any less onerous than requiring a party to sue where there are no courts?"); *Sax v. Votteler,* 648 S.W.2d 661 (Tex.1983) (limitation period unconstitutional as applied to minor). *See also Reed v. Wershba,* 698 S.W.2d 369 (Tex.Civ.App.—Houston [14th Dist.] 1985) (finding act constitutional as to plaintiff with "reasonable opportunity" to bring suit); *McCulloch v. Fox & Jacobs,* 696 S.W.2d 918 (Tex.Civ.App.—Dallas 1985) (*en banc* ) (analogous limitation period constitutional); *Melendez v. Beal,* 683 S.W.2d 869 (Tex.Civ.App.—Houston [1st Dist.] 1984) (limitation unconstitutional to unknowing patient); *Phillips v. Sharpstown General Hospital,* 664 S.W.2d 162 (Tex.Civ.App.—Houston [1st Dist.] 1983) (*rev'g* summary judgment but finding constitutional claims not waived).

vision, contained in article I, section 13, requires that "all courts be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." The section is interpreted broadly as a due process guarantee, and accords Texas citizens even greater protections than the federal guarantee of due process.[13] *See Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex.1983). The greater protections accorded by the open-courts provision have long been recognized; "a law which practically takes away from either party to litigation the right to a fair and impartial trial in the courts provided by the constitution for the determination of a given controversy denies a remedy by due course of law." *Dillingham v. Putnam,* 109 Tex. 1, 4, 14 S.W. 303, 304 (1890); *see also Middleton v. Texas Power & Light Co.,* 249 U.S. 152, 39 S.Ct. 227, 63 L.Ed. 527 (1919). The provision strikes down "unreasonable impediments to the right of redress," Harrington, *ante* n. 10, and does not allow the limitation on due-process rights created by limiting malpractice recovery.

The open-courts provision provides greater protection than the federal due-process guarantee largely by providing a less stringent test determining the validity of a limitation on malpractice recovery. Two requirements are presented by the open-courts provision—first, that a right to redress, such as a "cognizable common law cause of action," is being restricted, and, second, that the restriction is unreasonable or arbitrary when balanced against the "purpose and basis of the statute." *Sax,* 648 S.W.2d at 666. When a common law cause of action is displaced, an adequate substitute must be provided. *Id.* at 667; *see also Hanks v. City of Port Arthur,* 121 Tex. 202, 48 S.W.2d 944 (1932) *and Lebohm v. City of Galveston,* 154 Tex. 192, 275

S.W.2d 951 (1955). It is obvious that a challenge to the Act meets these requirements, as *Estrada,* 694 S.W.2d at 361, determined it had.

First, there is no doubt that limiting the amount of recovery of malpractice victims displaces a common-law cause of action in tort. Second, that displacement is, indeed, arbitrary and unreasonable when balanced against the purpose of the statute. *See ante* at 1105–1106. It is impossible for a seriously injured victim of malpractice to obtain any recompense above the statutory maximum for his or her injuries; how, one might ask, is this impossibility "any less onerous than requiring a party to sue where there are no courts?" *Nelson v. Krusen,* 678 S.W.2d 9 18, 922 (Tex.1984). There is, effectively, no forum to which an injured party may appeal for recompense of serious injuries due to malpractice; the legislature provides no adequate substitute to replace the traditional common-law right of recovery. Therefore, the plain language of the open-courts provision repels a law that closes the courts to the most seriously injured victims of malpractice.

For these reasons, sections 11.02–11.04 of the Medical Liability and Insurance Improvement Act, *Tex.Rev.Civ.Stat.Ann.* art. 4590i, are unconstitutional under both the federal and Texas constitutions; and, because these sections are invalid, no limitation will be placed on the plaintiff's recovery, as may be warranted by the evidence when this malpractice case is tried.

---

**13.** It is neither unusual nor improper for a state constitution to grant state residents greater protections than the federal constitution; the federal document establishes a foundation that the states are free to build upon. *See* Harrington, *The Texas Bill of Rights and Civil Liberties,* 17 Tex.Tech.L.Rev. 1487, 1497 (1986); *see also Olson v. State,* 484 S.W.2d 756, 762 (Tex.Crim.App.

1969) (state constitutions "may go further and provide greater safeguards" than the federal constitution). The state constitution has provided greater protections in areas of equal protection, *see* Harrington at 1506; due process, *see id.* at 1520; free speech, *see id.* at 1530; and criminal procedure, *see id.* at 1536.